147 T.C. No. 19

UNITED STATES TAX COURT

15 WEST 17TH STREET LLC, ISAAC MISHAN,
TAX MATTERS PARTNER, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 25152-11.                    Filed December 22, 2016.

On its 2007 partnership return LLC claimed a charitable contribution deduction of $64,490,000. In order to substantiate a charitable contribution deduction of $250 or more, a taxpayer must secure and maintain in its files a "contemporaneous written acknowledgment" (CWA) from the donee organization. I.R.C. sec. 170(f)(8)(A). The CWA must state (among other things) whether the donee provided the donor with any goods or services in exchange for the gift. I.R.C. sec. 170(f)(8)(B)(ii).

The substantiation requirements of subparagraph (A) do not apply to a contribution "if the donee organization files a return, on such form and in accordance with such regulations as the Secretary may prescribe," that includes the information specified in subparagraph (B). I.R.C. sec. 170(f)(8)(D). To date, the Secretary has not issued regulations to implement the donee-reporting regime referred to in subparagraph (D).

R audited LLC's 2007 return and disallowed the charitable contribution deduction in its entirety. After the case was docketed in this Court, the donee organization submitted an amended Form 990, Return of Organization Exempt from Income Tax, that included the information specified in subparagraph (B). P filed a motion for partial summary judgment, contending that this action by the donee eliminated the need for a CWA to substantiate LLC's gift.

1. <u>Held</u>: I.R.C. sec. 170(f)(8)(D) sets forth a discretionary delegation of rulemaking authority, and it is not self-executing in the absence of the regulations to which the statute refers.

2. <u>Held</u>, <u>further</u>, the general rule set forth in subparagraph (A), requiring a CWA meeting the requirements of subparagraph (B), is fully applicable to the gift at issue.

<u>Jeremy M. Klausner</u>, <u>Frank Agostino</u>, and <u>Lawrence Sannicandro</u>, for petitioner.

<u>Marc L. Caine</u> and <u>Carina Campobasso</u>, for respondent.

OPINION

LAUBER, <u>Judge</u>: This case is before the Court on petitioner's motion for partial summary judgment. The motion presents a question of statutory construction involving the relationship between subparagraphs (A) and (D) of section 170(f)(8), which governs substantiation requirements for certain charitable con-

tributions.[1]  Section 170(f)(8)(A) provides that no deduction shall be allowed for any charitable contribution of $250 or more unless the taxpayer substantiates the gift by a "contemporaneous written acknowledgment" (CWA) from the donee organization.  The CWA must state (among other things) whether the donee supplied the donor with any goods or services in consideration for the gift and (if so) must furnish a description and good-faith estimate of the value of such goods or services.  Sec. 170(f)(8)(B)(ii) and (iii).

After the petition in this case was filed, the donee organization submitted an amended return for the year in which the gift was made.  This amended return described the gift from 15 West 17th Street LLC (LLC) and included a statement that the donee had provided the LLC with no goods or services in consideration for that gift.  Petitioner contends that this action by the donee eliminated the need for a CWA, relying on section 170(f)(8)(D).  That section provides that "[s]ubparagraph (A) shall not apply to a contribution if the donee organization files a return, on such form and in accordance with such regulations as the Secretary may prescribe, which includes the information described in subparagraph (B) with respect to the contribution."

---

[1]All statutory references are to the Internal Revenue Code (Code) in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.  We round all monetary amounts to the nearest dollar.

The Internal Revenue Service (IRS or respondent) advances two arguments in opposition to petitioner's motion for partial summary judgment. First, respondent contends that section 170(f)(8)(D) is not "self-executing," i.e., that it will become operative only when the Secretary publishes the regulations to which the statute refers. Since the Secretary has not issued such regulations, respondent contends that subparagraph (A) remains applicable and that a proper CWA was necessary to substantiate petitioner's contribution. Second, in the event we determine that section 170(f)(8)(D) is operative in the absence of regulations, respondent contends that the term "return" as used in this subparagraph means the donee organization's original return for the period in question and cannot include an amended return.

We conclude that the rulemaking authority delegated in subparagraph (D) is discretionary, not mandatory, and that subparagraph (D) is not self-executing in the absence of regulations. We accordingly hold that the general rule set forth in subparagraph (A), requiring a CWA meeting the requirements of subparagraph (B), is fully applicable for the gift at issue. Because we will deny petitioner's motion for partial summary judgment on this ground, we need not address respondent's alternative argument.

## Background

There is no dispute as to the following facts, which are drawn from the parties' summary judgment papers and from the stipulations of facts and attached exhibits filed previously. At the time of the filing of the petition, the LLC had its principal place of business in New York.

In September 2005 the LLC purchased, for $10 million, a property in New York City, Borough of Manhattan, known as block 558, lot 43. This property comprised two parcels. The building on the northern parcel, at 126-128 East 13th Street, is the Van Tassell & Kearney Auction Mart (VTK Building). The VTK Building was built in 1903-04 for staging horse auctions. It was later used as a candy factory, as a vocational school for women, and as the studio of Frank Stella, a well-known artist.

The LLC initially planned to demolish the VTK Building. However, the Greenwich Village Society for Historic Preservation petitioned the New York City Landmarks Preservation Commission to designate the VTK Building an individual landmark. The commission calendared an emergency hearing in September 2006 to consider this request. On November 29, 2007, the VTK Building was placed on the National Register of Historic Places, and it thus became a "certified historic structure" within the meaning of section 170(h)(4)(C)(i).

On December 20, 2007, the LLC executed in favor of the Trust for Architectural Easements (Trust) a historic preservation deed of easement. This deed granted the Trust a perpetual conservation easement over the north parcel of the property, including the VTK Building. The Trust is an organization described in section 501(c)(3) and is a "qualified organization" under section 170(h)(3).

The LLC's contribution of the easement to the Trust was completed for Federal tax purposes in 2007. On May 14, 2008, the Trust sent the LLC a letter acknowledging receipt of the easement. This letter did not state whether the Trust had provided any goods or services to the LLC, or whether the Trust had otherwise given the LLC anything of value, in exchange for the easement.

The LLC secured an appraisal concluding that, as of February 8, 2008, the property had a fair market value of $69,230,000 before placement of the easement. The appraisal thus opined that the property--acquired for $10 million in September 2005--had risen in value by almost 600% in 2-1/2 years. Opining that the property was worth only $4,740,000 after the donation, the appraisal concluded that the easement had reduced the property's value by $64,490,000.

The LLC filed its 2007 Form 1065, U.S. Return of Partnership Income, on October 17, 2008. On this return, the LLC deducted $64,490,000, the alleged value of the easement, as a charitable contribution to the Trust. The LLC included

with its return a copy of the appraisal report, a copy of the Trust's May 14, 2008, letter, and Form 8283, Noncash Charitable Contributions, executed by the appraiser and by a representative of the Trust.

On August 19, 2008, the Trust filed Form 990, Return of Organization Exempt From Income Tax, for calendar year 2007. On that return, the Trust did not report receipt of a charitable contribution from the LLC. Nor did it report whether it had provided any goods or services to the LLC in exchange for the easement.

The IRS selected the LLC's 2007 return for examination. On August 28, 2011, the IRS mailed the LLC a notice of final partnership administrative adjustment (FPAA), which was followed by a supplementary FPAA on September 27, 2011. In the supplementary FPAA the IRS disallowed the charitable contribution deduction in full because "[i]t has not been established that all the requirements of IRC Section 170 and the corresponding Treasury Regulations * * * have been satisfied for the noncash charitable contribution." In the alternative, the IRS determined that the value of the easement was substantially less than the $64,490,000 claimed on the return. The IRS determined penalties for gross valuation misstatement under section 6662(a) and (h) and (alternatively) for negligence under section 6662(a) and (b)(1).

On November 2, 2011, the LLC's tax matters partner timely petitioned this Court for review of the supplementary FPAA. On June 16, 2014, the Trust prepared an amended Form 990 for 2007 and mailed it to the IRS Service Center in Ogden, Utah. Part III of Form 990 is captioned "Statement of Program Service Accomplishments." On its original Form 990 filed in 2008, the Trust had described these accomplishments in an attached statement, which summarized the easement donations it had received during 2007. On the amended Form 990 filed in 2014, the Trust added the following two sentences to that description: "One of the New York donations received during 2007 included the donation by 15 West 17th Street LLC of an Historic Preservation Deed of Easement * * *. The Trust provided no goods or services to 15 West 17 Street LLC in consideration for its donation of the Historic Preservation Deed of Easement."

The Ogden Service Center received the amended Form 990 on June 23, 2014. Respondent does not dispute petitioner's assertion that the Service Center accepted this amended return for filing. The record does not reveal whether the Service Center personnel were aware that the LLC's return had previously been examined or that this case was pending in litigation.

## Discussion

The purpose of summary judgment is to expedite litigation and avoid unnecessary and time-consuming trials. See FPL Grp., Inc. & Subs. v. Commissioner, 116 T.C. 73, 74 (2001). We may grant partial summary judgment when there is no genuine dispute of material fact and a decision may be rendered as a matter of law. Rule 121(b); Elec. Arts, Inc. v. Commissioner, 118 T.C. 226, 238 (2002). The parties agree on all facts relevant to disposition of petitioner's motion, and the issue of statutory construction it presents involves a pure question of law. We conclude that this question is appropriate for summary adjudication.

I.      Statutory and Regulatory Framework

A.      Governing Statutory Provisions

Section 170(a)(1) allows a deduction for charitable contributions made during the taxable year. Generally, the amount of the deduction is the value of the property contributed reduced by the value of any consideration that the taxpayer receives in exchange for the gift. Addis v. Commissioner, 118 T.C. 528, 536 (2002), aff'd, 374 F.3d 881 (9th Cir. 2004). Payments to a charity that are "made partly as a contribution and partly in consideration for goods or services provided to the donor by the donee" are often called "quid pro quo contributions." Ibid.

To address tax-compliance problems that had arisen in connection with quid pro quo contributions, Congress in 1993 enacted section 170(f)(8), captioned "Substantiation Requirement for Certain Contributions." Section 170(f)(8)(A) provides: "No deduction shall be allowed * * * for any contribution of $250 or more unless the taxpayer substantiates the contribution by a contemporaneous written acknowledgment of the contribution by the donee organization that meets the requirements of subparagraph (B)." A CWA need not take any particular form; it may be furnished to the donor (for example) by letter, postcard, or computer-generated media. French v. Commissioner, T.C. Memo. 2016-53, at *7; Schrimsher v. Commissioner, T.C. Memo. 2011-71, 101 T.C.M. (CCH) 1329, 1331 (citing legislative history).

The requirement that a CWA be obtained for charitable contributions of $250 or more is a strict one. In the absence of a CWA meeting the statute's demands, "[n]o deduction shall be allowed." Sec. 170(f)(8)(A); see French, at *8 ("If a taxpayer fails to meet the strict substantiation requirements of section 170(f)(8), the entire deduction is disallowed."). The doctrine of substantial compliance does not apply to excuse failure to obtain a CWA meeting the statutory requirements. French, at *8; Durden v. Commissioner, T.C. Memo. 2012-140, 103 T.C.M. (CCH) 1762, 1763-1764. "The deterrence value of section 170(f)(8)'s

total denial of a deduction comports with the effective administration of a self-assessment and self-reporting system." Addis, 374 F.3d at 887.

Section 170(f)(8)(B) provides that a CWA must include the following information:

> (i) The amount of cash and a description (but not value) of any property other than cash contributed.

> (ii) Whether the donee organization provided any goods or services in consideration, in whole or in part, for any property described in clause (i).

> (iii) A description and good faith estimate of the value of any goods or services referred to in clause (ii) * * *.

An acknowledgment qualifies as "contemporaneous" only if the donee provides it to the taxpayer on or before the earlier of "the date on which the taxpayer files a return for the taxable year in which the contribution was made" or "the due date (including extensions) for filing such return." Sec. 170(f)(8)(C)(i) and (ii).

Section 170(f)(8)(D) provides that "[s]ubparagraph (A) shall not apply to a contribution if the donee organization files a return, on such form and in accordance with such regulations as the Secretary may prescribe, which includes the information described in subparagraph (B) with respect to the contribution." The question we must decide is whether the Trust's filing in 2014 of an amended Form

990 operates, by virtue of subparagraph (D), to render the CWA requirement of subparagraph (A) inapplicable to the LLC's gift.

B.    Legislative History

"Congress enacted the substantiation requirements of section 170(f)(8) to require charitable organizations that receive quid pro quo contributions * * * to inform their donors that the deduction under section 170 is limited to the amount by which the payment exceeds the value of goods or services provided by the charity." Addis, 118 T.C. at 536. Section 170(f)(8) is "a compliance provision designed to foster disclosure of 'dual payment' or quid pro quo contributions." Viralam v. Commissioner, 136 T.C. 151, 171 (2011).

Congress enunciated two principal purposes for this compliance provision. The first purpose was "to assist taxpayers in determining the deductible amounts of their charitable contributions." Durden, 103 T.C.M. (CCH) at 1763; see DiDonato v. Commissioner, T.C. Memo. 2011-153, 101 T.C.M. (CCH) 1739, 1742 (noting purpose "to inform the donor that all or a portion of an amount contributed * * * may not be deductible"). The second purpose was "to assist the Internal Revenue Service in processing tax returns on which charitable contribution deductions are claimed." Durden, 103 T.C.M. (CCH) at 1763; see DiDonato, 101

T.C.M. (CCH) at 1742 (noting purpose "to ease the administration and audit of charitable contribution deductions").

The substantiation requirement now codified in section 170(f)(8) originated in the President's Budget Proposal for 1993, sent to Congress on January 29, 1992. Office of Mgmt. & Budget, Exec. Office of the President, Budget of the United States Government, Fiscal Year 1993 Part Two 7 (1992). That budget proposed several revenue-losing changes in the law governing tax-exempt organizations. Ibid. The President proposed that these changes "would be financed by requiring charitable organizations to file with the Internal Revenue Service annual information returns reporting charitable contributions in excess of $500 from any one donor during the preceding calendar year." Ibid. The original version of the substantiation requirement thus took the form of mandatory donee reporting.

The Ways and Means Committee held a hearing on the President's tax proposals in early February 1992. U.S. Economy, and Proposals to Provide Middle-Income Tax Relief, Tax Equity and Fairness, Economic Stimulus and Growth: Hearing Before the H. Comm. on Ways and Means, 102d Cong. 939 (1992). Although the donee reporting provision received little attention, Congressman Schulze worried that it might create "a firestorm that * * * [will] come back to haunt us." Id. at 1034. He explained:

My concern is, if you make a contribution over $500 and have to put your taxpayer identification number in, and the charity then has to report that as well, and later on that will be matched up. Are we going to have an area where relatively small charities that are somewhat unsophisticated are going to be reporting this, and then it's going to be matched at IRS, and people are going to get in trouble if a number is off? We've had some of these problems before, and they have been major problems. I just do not want to see us get into that situation with 501(c)(3)'s.

Treasury Secretary Brady acknowledged the validity of this concern. Ibid. He pledged that he and Assistant Secretary Goldberg would "try very hard to make sure that there will not be any inconveniences of the kind you talk about." Ibid.

During another Ways and Means Committee hearing, representatives from charitable organizations indicated their support for greater tax compliance. Permanent Extension of Certain Expiring Tax Provisions: Hearing Before the H. Comm. on Ways and Means, 102d Cong. 498, 517-518 (1992). But they likewise expressed concern about the donee reporting provision, which they thought required modification. See id. at 518 ("[B]eneficiary institutions need to accept an equity of burden, although we believe that we need to have a conversation with the Treasury Department so that we can work out how that is done.").

On July 2, 1992, Senator Moynihan introduced the Charitable Contribution Tax Act of 1992. S. 2979, 102d Cong. (1992). In this bill, the requirement that charities file annual information returns reporting charitable contributions was

eliminated.  See id. sec. 5.  It was replaced by a CWA requirement substantially identical to that now in section 170(f)(8)(A), except that a CWA would have been required "for any contribution of $100 or more."  Ibid.  The President's original proposal for donee reporting was retained in a back-up provision resembling current subparagraph (D), providing that a CWA would not be required "if the donee organization files a return, on such form and in accordance with such regulations as the Secretary may prescribe," reporting the information specified in subparagraph (B).  Ibid.

Senator Danforth, a co-sponsor of S. 2979, noted that the bill "was the product of lengthy discussion" between the charitable community and policymakers in Congress and the Treasury Department.  138 Cong. Rec. 18038 (1992).  He explained:  "An earlier version of some of the proposals in this bill appeared in the President's 1993 budget.  The charitable community was concerned about certain provisions in the reporting requirements area.  * * * [Assistant Secretary] Goldberg listened to the views of the charitable community and took primary responsibility for addressing their concerns."  Ibid.

This Senate bill became part of H.R. 11, which was eventually pocket-vetoed by President George H. W. Bush.  H.R. 11, 102d Cong., sec. 8003 (1992) (as reported in the Senate, July 23, 1992); Memorandum of Disapproval for the

Revenue Act of 1992, 2 Pub. Papers 2154 (Nov. 4, 1992).  The charitable substantiation provision--now with a CWA requirement for gifts of $750 or more-- was brought back in H.R. 2264 as reported to the House on May 25, 1993.  The report accompanying that bill explained the Committee's belief that

> there will be increased compliance with present-law rules governing charitable contribution deductions if a taxpayer who claims a charitable contribution of $750 or more is required to obtain substantiation from the donee indicating the amount of the contribution and whether any goods, service, or privilege was received by the donor in exchange for making the contribution.

H.R. Rept. No. 103-111, at 785 (1993), 1993-3 C.B. 167, 361.  The report explained that the proposed amendment "does not impose an information reporting requirement upon charities."  Id.  Rather, it "places the responsibility upon taxpayers * * * to request (and maintain in their records) substantiation from the charity of their contribution (and any good or service received in exchange)." Ibid.  The Senate version of the bill reduced the $750 monetary threshold, requiring a CWA to substantiate all gifts of $250 or more.  H.R. 2264, 103d Cong., sec. 8172 (1993) (as amended by the Senate, June 22, 1993).  In this respect the conference report followed the Senate amendment.  See H.R. Conf. Rept. No. 103-213, at 565 (1993), 1993-3 C.B. 393, 443.  Addressing the concerns charities had expressed about donor privacy, the conference report emphasized that a CWA

"need <u>not</u> contain the taxpayer's social security number or taxpayer identification number (TIN)." <u>Id.</u> n.30, 1993-3 C.B. at 443 (emphasis in original). The conference report also emphasized that CWAs must be explicit about the absence of a quid pro quo: "If the donee organization provided no goods or services to the taxpayer * * *, the written substantiation is required to include a statement to that effect." <u>Ibid.</u> Addressing the back-up mechanism for donee reporting, the conference report explained: "Substantiation is not required if the donee organization files a re-turn with the IRS (in accordance with Treasury regulations) reporting information sufficient to substantiate the amount of the deductible contribution." <u>Id.</u> at 565.

With the reduction of the monetary threshold to $250, the House provision as set forth in H.R. 2264 was enacted as part of the Omnibus Budget Reconciliation Act of 1993 (OBRA), Pub. L. No. 103-66, sec. 13172(a), 107 Stat. at 455, and codified as section 170(f)(8). Congress made the new substantiation requirements effective for contributions made on or after January 1, 1994. <u>See</u> OBRA sec. 13172(b), 107 Stat. at 456; H.R. Conf. Rept. No. 103-213 at 567, 1993-3 C.B. at 445. Congress expressed its intention that, "following enactment of the bill, the Secretary of the Treasury will expeditiously issue a notice or other announcement providing guidance with respect to the substantiation and disclosure provisions."

Id. at 567 n.38, 1993-3 C.B. at 445.  In March 1995 the IRS provided transitional relief for the 1994 tax year, extending to October 16, 1995, the date by which taxpayers were required to obtain CWAs for 1994 gifts.  See Notice 95-15, 1995-15 I.R.B. 22.

C.    Regulations

In August 1995 the Treasury Department issued proposed regulations providing guidance concerning the implementation of section 170(f)(8).  See 60 Fed. Reg. 39896-39903 (Aug. 4, 1995).  The proposed regulations addressed in detail the requirements of section 170(f)(8)(A), (B), and (C) but made no provision for donee reporting by charitable organizations under subparagraph (D).  See ibid. The IRS requested public comments and scheduled a hearing for November 1, 1995.  See 60 Fed. Reg. 39896.[2]

The IRS received several hundred pages of comments.  Only one commenter, an Indianapolis accounting firm, addressed donee reporting.  It recommended that donee organizations be allowed to "satisfy the substantiation requirement by reporting directly to the IRS," but it noted that "the proposed regulations do not

---

[2]On November 6, 2015, we directed respondent to provide any written public comments submitted in response to the rulemaking proceedings involving sec. 170(f)(8).  Respondent filed a response with about 170 pages of attachments.  The attachments include all public comments received by the Treasury Department and a transcript of the November 1, 1995, hearing.

provide any such guidance or opportunity." It urged that "the regulations should be drafted to provide that in certain situations substantiation can be provided directly to the IRS by the filing of a Form 990 or Form 990-PF," suggesting that "[t]his provision would be particularly helpful to private foundations and small charitable organizations." None of the speakers who appeared at the November 1, 1995, hearing mentioned donee reporting.

On December 16, 1996, the Treasury Department promulgated final regulations under section 170(f)(8). See T.D. 8690, 1997-1 C.B. 68. These regulations currently appear in substantially the same form as section 1.170A-13(f)(1) through (8), Income Tax Regs. In the preamble, the IRS explained why the final regulations did not implement donee reporting under section 170(f)(8)(D):

> One commenter suggested that the regulations should allow charities to report charitable contributions directly to the IRS on Form 990 or 990-PF. Section 170(f)(8) authorizes the Secretary to prescribe regulations allowing donee organizations to satisfy the requirements of section 170(f)(8) by filing a return that includes the information described in section 170(f)(8)(B). The IRS and Treasury have decided not to implement the suggestion at this time. However, in an effort to reduce paperwork and taxpayer burdens, the IRS will examine whether any existing IRS forms can be modified to assist in their use in substantiating charitable contributions. [T.D. 8690, 1997-1 C.B. at 71.]

During the ensuing 16 years, the IRS received no public request for implementation of donee reporting. On August 9, 2013, the IRS nevertheless put on its

Priority Guidance Plan a regulation project to address this subject. U.S. Dep't. of the Treasury, Office of Tax Policy and Internal Revenue Service, 2013-2014 Priority Guidance Plan (General Tax Issues, Item 30) (2013). On September 17, 2015, the IRS issued a notice of proposed rulemaking (NPRM) "to implement the exception to the 'contemporaneous written acknowledgment' requirement for substantiating charitable contribution deductions of $250 or more." 80 Fed. Reg. 55802 (Sept. 17, 2015).

The NPRM began by noting that the Treasury Department in 1997 had "specifically declined to issue regulations under section 170(f)(8)(D) to effectuate donee reporting." Id. 55803. Having thereafter encountered "few requests * * * to implement a donee reporting system," the IRS found that "[t]he present CWA system works effectively, with minimal burden on donors and donees." Ibid. However, prompted by questions (such as that raised by the instant case) as to whether an amended Form 990 or 990-PF could be used as a vehicle for donee reporting, the Commissioner determined to propose rules governing this subject. Ibid.

The NPRM expressed the Treasury Department's view that implementation of a donee reporting system would require resolution of several threshold issues concerning the manner of such reporting. Ibid. The NPRM focused on three issues in particular.

The first threshold issue concerned the appropriate IRS form to be used for such reporting. Section 170(f)(8)(D) provides that any donee reporting shall be accomplished "on such form * * * as the Secretary may prescribe." The NPRM expressed the Treasury Department's conclusion that, "[i]n order to better protect donor privacy, * * * the Form 990 series should not be used for donee reporting." 80 Fed. Reg. 55803. Instead, the IRS said that it would develop, before finalizing regulations, "a specific-use information return for donee reporting." Ibid. For that reason, the proposed regulation addressing this subject, captioned "Donee organization reporting--Prescribed form," was marked "Reserved." See id. 55805.

The second threshold issue concerned the required contents of the donee's report. Unlike a CWA mailed to a taxpayer, "the donee reporting information return will be sent to the IRS, which must have a means to store, maintain, and readily retrieve the return information for a specific taxpayer if and when substantiation is required in the course of an examination." 80 Fed. Reg. 55804. The NPRM concluded that "[t]he donor's taxpayer identification number * * * [would be] necessary in order to properly associate the donation information with the correct donor." Id. The IRS expressed concern "about the potential risk for identity theft involved * * * given that donees will be collecting donors' taxpayer identification numbers and maintaining those numbers for some period of time." Id.

The NPRM requested public comments as to whether "additional guidance is necessary regarding the procedures a donee should use * * * to mitigate th[is] risk." Ibid.

The third threshold issue concerned the time for donee reporting. The IRS noted that "[s]ection 170(f)(8) is premised on donors receiving timely substantiation of their donations of $250 or more." Id. The statute requires that a CWA be issued by the earlier of "the date on which the taxpayer files * * * [his] return" or "the due date (including extensions) for filing such return." Sec. 170(f)(8)(C)(i) and (ii). The NPRM concluded that "any alternative method to using a CWA for substantiating charitable contributions through donee reporting must provide timely information to both the IRS and the donor." 80 Fed. Reg. 55804. The proposed regulations accordingly provided that any donee information return must be filed "on or before February 28 of the year following the calendar year in which the contribution was made," so that the substantiating data would be available to taxpayers expecting to file their returns on April 15. Id. 55805. The IRS noted that "February 28th is the date when numerous other information returns * * * must be filed." Id. 55804.

The NPRM requested public comments by December 16, 2015. See id. 55802. The number of comments received apparently exceeded 38,000. See

Substantiation Requirement for Certain Contributions, http://www.regulations.gov /#!docketDetail;D=IRS-2015-0049 (last visited May 17, 2016). Three weeks later, after considering these comments, the Secretary withdrew the proposed regulations in their entirety. See 81 Fed. Reg. 882 (Jan. 8, 2016).

In withdrawing the proposed regulations, the Secretary explained that the public comments had "questioned the need for donee reporting" and had "expressed significant concerns about donee organizations collecting and maintaining taxpayer identification numbers." 81 Fed. Reg. 882. Respondent represents that "[a]n overwhelming number of comments expressed significant concerns that even a voluntary system of donee reporting could have a substantial adverse effect on charitable giving by all potential donors." Ibid. The Treasury Department accordingly "decided against implementing the statutory exception to the CWA requirement," reiterating its position that this exception "remains unavailable unless and until final regulations are issued prescribing the method for donee reporting." Ibid.

II.  Analysis

Section 170(f)(8)(D) provides that a CWA is not needed to substantiate a charitable contribution "if the donee organization files a return, on such form and in accordance with such regulations as the Secretary may prescribe, which in-

cludes the information" that a CWA is supposed to include. We confront at the outset a question that requires us to identify the "regulations" to which subparagraph (D) refers. Petitioner contends that the "regulations" in question are the regulations governing the filing of charities' annual information returns, see sec. 1.6033-2, Income Tax Regs., and that the "form" referenced in subparagraph (D) is Form 990. Judge Gustafson embraces this argument in his dissenting opinion. See Gustafson op. p. 62. Here, the Trust filed an amended return on Form 990 that included the information that a CWA was supposed to include. Petitioner argues that the Trust thereby satisfied subparagraph (D) because it "file[d] a return on such form and in accordance with such regulations as the Secretary [has] prescribe[d]."

This argument is unpersuasive for at least two reasons. The statutory requirement that charities file annual information returns, currently codified in section 6033(b), has been on the books since 1943. See Revenue Act of 1943, ch. 63, sec. 117, 58 Stat. at 36. The current regulations governing the contents of these information returns were promulgated in June 1971. T.D. 7122, 1971-2 C.B. 393. In 1993, when Congress enacted section 170(f)(8), the requirement that charities file annual information returns on Form 990 was well established and familiar to all concerned. If Congress had intended in subparagraph (D) to refer to these pre-

existing regulations, it is unlikely to have used the formula, "in accordance with such regulations as the Secretary may prescribe."

More fundamentally, the Code contains hundreds of sections authorizing the Secretary to issue regulations. See infra pp. 29-31, 36-40. Apart from general authorizations for rulemaking such as section 7805, these provisions clearly refer to regulations, yet to be issued, that will interpret the Code section in which the authorization for rulemaking is contained. Section 169(b), for example, provides that an election to amortize pollution control facilities "shall be made by filing with the Secretary, in such manner, in such form, and within such time, as the Secretary may by regulations prescribe, a statement of such election." It seems obvious that the "regulations" to which this statute refers are not the regulations requiring individuals to file their tax returns on Forms 1040, U.S. Individual Income Tax Return. Rather, Congress was referring to regulations that it expected the Secretary to issue under section 169, which he did issue, governing "the time and manner of making elections" under section 169(b). See sec. 1.169-4, Income Tax Regs.

The same reasoning applies here. When Congress in subparagraph (D) referred to the filing of a return "on such form and in accordance with such regulations as the Secretary may prescribe," it was referring to regulations that the Secre-

tary might in future promulgate, under section 170(f)(8), that would specify the appropriate procedure for reporting by donee organizations. The Secretary has not yet promulgated--indeed, he has declined to promulgate--such regulations.[3]

This case thus requires us to address a question that has arisen with some frequency: How should a court respond when a taxpayer or the IRS desires to have a particular tax treatment apply in the absence of the regulations to which the statute refers? In some cases, the Secretary may have affirmatively declined to issue regulations, having concluded that they are unnecessary or inappropriate. In other cases, the Secretary may intend to issue regulations but may have encountered delays because of subject matter complexity or the press of other business.

[3]The fact that charities are required to report some donor information on Form 990 does not support the dissent's position. Charities that file Form 990 have long been required to identify contributors who make annual gifts in excess of $5,000. See sec. 1.6033-2(a)(2)(ii)(f), Income Tax Regs. But this information is reported to assist the IRS, not in auditing the donors' contributions, but in auditing the charity's compliance with "public charity" rules and the bar against private inurement. A charity may have a handful of donors who make gifts in excess of $5,000 but many thousands of donors who make gifts in excess of $250; there is simply no place on the Form 990 to report such a volume of information. The Form 990, moreover, requires the reporting only of donors' "names and addresses," without any taxpayer identification numbers (TINs). Without TINs, the IRS would have no practical way of associating the information reported on the Form 990 with the individual returns of the donors who made the gifts. Finally, many organizations that receive tax-deductible contributions, such as churches and Federal and State governmental entities, do not file Forms 990. See sec. 6033(a), (c). For all these reasons, the reference to "regulations" in subparagraph (D) cannot plausibly be read to mean the regulations requiring charities to file returns on Form 990.

Courts have described the question presented here as whether the statute is "self-executing" in the absence of regulations. Parker-Hannifin Corp. v. Commissioner, 139 F.3d 1090, 1099 (6th Cir. 1998), aff'g in part, rev'g in part T.C. Memo. 1996-337; United States v. Mustari, 109 F.2d 438, 440 (7th Cir. 1940); Hillman v. Commissioner, 114 T.C. 103, 111 (2000), rev'd on this issue, 263 F.3d 338 (4th Cir. 2001).

The courts have struggled to define the proper judicial response in these scenarios. In each case, Congress has delegated to an executive branch agency the task of using its expertise to craft appropriate regulations. Under the Administrative Procedure Act and familiar separation-of-powers principles, a court's usual role is to review the regulations an agency has issued, not to conjure what regulations might look like had they been promulgated. On the other hand, if it is absolutely clear that Congress intended that a particular tax benefit or tax treatment should be available, a legitimate question arises as to whether the IRS may prevent that outcome by declining to engage in rulemaking. Commentators have described this scenario as one of "spurned delegations" and the resulting judicial dilemma as one of crafting "phantom regulations." See Phillip Gall, "Phantom Tax Regulations: The Curse of Spurned Delegations," 56 Tax Law. 413 (2003); Amandeep

Grewal, "Substance Over Form? Phantom Regulations and the Internal Revenue Code," 7 Houston Bus. & Tax J. 42 (2006).

In approaching these cases, the courts have focused principally, as they must, on the text of the delegating provision. "[O]ur inquiry begins with the statutory text, and ends there as well if the text is unambiguous." BedRoc Ltd. v. United States, 541 U.S. 176, 183 (2004). In conjunction with the text, we have examined the statute's legislative history and considered whether it "can be applied without further explication in a regulation." Temsco Helicopters, Inc. v. United States, 409 F. App'x 64, 67 (9th Cir. 2010) (citing Francisco v. Commissioner, 119 T.C. 317, 322-323 (2002), aff'd on other grounds, 370 F.3d 1228 (D.C. Cir. 2004)). In examining the statutory text, it is useful to begin by considering whether Congress couched its delegation of rulemaking authority in mandatory or permissive terms.

A.  Delegations for Mandatory Rulemaking

Most of our cases have dealt with delegations of mandatory rulemaking authority (mandatory delegations), where the statute is "framed in terms of commanding the Secretary to prescribe regulations." First Chicago Corp. v. Commissioner, 88 T.C. 663, 676 (1987), aff'd, 842 F.2d 180 (7th Cir. 1988); Grewal, supra, at 47 ("The major cases deal largely with mandatory delegations, which the

courts usually deem self-executing.").  A mandatory delegation "requires the Secretary to issue regulations that achieve a particular result or that apply a particular rule," Gall, supra, at 415, and commonly takes the form of "the Secretary shall prescribe regulations" or states that something shall happen "under regulations prescribed by the Secretary,"  ibid.

Most of the mandatory-delegation cases have involved "taxpayer friendly" provisions, that is, Code sections in which Congress has made available a credit, deduction, or other tax benefit.  See Grewal, supra, at 46.  Our first opinions on this subject addressed section 58(h) as enacted in 1976.  See Tax Reform Act of 1976 (TRA '76), Pub. L. No. 94-455, sec. 301(g), 90 Stat. at 1553.  Former section 58(h) provided:  "The Secretary shall prescribe regulations under which items of tax preference shall be properly adjusted where the tax treatment giving rise to such items will not result in the reduction of the taxpayer's tax under this subtitle for any taxable years."

In Occidental Petroleum Corp. v. Commissioner, 82 T.C. 819 (1984), we held section 58(h) self-executing in the absence of regulations.  Reviewing the legislative history, we concluded that Congress clearly intended that the minimum tax should not apply where (as was true in that case) the taxpayer had derived no tax benefit from the tax-preference items.  Noting that eight years had passed since

section 58(h) became effective, Judge Raum ruled that "the failure to promulgate the required regulations can hardly render the new provisions * * * inoperative." Id. at 829. We held that "we must give effect to these provisions in the absence of regulations," reasoning that "Congress could hardly have intended to give the Treasury the power to defeat the [statute's] legislatively contemplated operative effect * * * merely by failing to discharge the statutorily imposed duty to promulgate the required regulations." Ibid.

Three years later in First Chicago Corp., 88 T.C. at 676, we reached the same result for the same reasons, emphasizing the statute's mandatory wording: "[S]ection 58(h) is framed in terms of commanding the Secretary to prescribe regulations. It states that 'The Secretary shall prescribe regulations.'" Because the Secretary had "failed to carry out the mandate imposed upon him by the Congress," the Court found itself obligated "to act in his place," while noting that "[w]e do not relish doing the Secretary's work for him." Id. at 676, 677. In a footnote we observed that "[t]he Tax Reform Act of 1986 has changed this language to: 'The Secretary may prescribe regulations.'" Id. at 676 n.11 (emphasis in original). We concluded that "[t]he effect of that change in language can be of no concern to this Court * * * since the change d[id] not apply" to the 1980-1981 tax years at issue. Ibid.

The next wave of cases addressed section 2032A, enacted in 1976, which provided beneficial estate tax treatment for certain farm property. See TRA '76 sec. 2003, 90 Stat. at 1856. Section 2032A(g) provided (and still provides): "The Secretary shall prescribe regulations setting forth the application of this section * * * in the case of an interest in a partnership, corporation, or trust which, with respect to the decedent, is an interest in a closely held business." After the lapse of 13 years without issuance of regulations, we held the statute self-executing in their absence. See Estate of Hoover v. Commissioner, 102 T.C. 777 (1994), rev'd on other grounds, 69 F.3d 1044 (10th Cir. 1995); Estate of Maddox v. Commissioner, 93 T.C. 228 (1989).

Reviewing the legislative history, we discerned that "Congress did not want the estate of a stockholder of a family corporation to be deprived of the benefits of section 2032A." Estate of Maddox, 93 T.C at 233. However, in order "to deal with the myriad problems and situations that could arise in that connection," Congress "directed (not merely authorized) the Secretary to prescribe regulations." Ibid. Citing Occidental Petroleum and First Chicago Corp., we concluded: "[W]e must do the best we can * * * in the absence of the pertinent regulations, since, in our view, the Secretary cannot deprive a taxpayer of rights which the Congress plainly intended to confer." Id. at 233, 234. In both Estate of Maddox and Estate

of Hoover, we emphasized the mandatory nature of the authority Congress had delegated. See Estate of Hoover, 102 T.C. at 782 (noting that the Secretary had failed to issue "the regulations that Congress ordered he 'shall' prescribe"); Estate of Maddox, 93 T.C. at 233 ("Congress provided that the Secretary 'shall' prescribe the regulations.").[4]

When addressing "taxpayer unfriendly" statutes, courts have often approached the problem by considering whether Congress directed the Secretary to determine "whether" a particular tax treatment shall apply, or simply to decide "how" a legislatively ordained tax treatment is to be implemented. In Estate of Neumann v. Commissioner, 106 T.C. 216 (1996), we addressed the application of the generation-skipping transfer (GST) tax to "direct skip" transfers by non-resident aliens. Section 2663(2), enacted in the Tax Reform Act of 1986, Pub. L. No. 99-514, sec. 1431(a), 100 Stat. at 2729, provided: "The Secretary shall pre-

---

[4]Subsequent cases finding to be self-executing Code sections providing that the Secretary "shall prescribe regulations" have stressed the provisions' taxpayer-friendly character. In Francisco we addressed section 931(d)(2), which provided that the determination as to whether certain income is possessions-source income "shall be made under regulations prescribed by the Secretary." 119 T.C. at 322. We held the statute to be self-executing despite the absence of regulations, noting the principle "that the Secretary's failure to issue regulations does not bar application of a beneficial tax statute." Id. at 324; see also Hillman, 114 T.C. at 103, 113 (2000) (rejecting position that "congressionally intended benefits can be withheld simply by the refusal * * * to issue regulations"), rev'd on this issue, 263 F.3d 338 (4th Cir. 2001).

scribe such regulations as may be necessary or appropriate to carry out the purposes of this chapter," including regulations providing for its application "in the case of transferors who are nonresidents not citizens of the United States."

Judge Tannenwald framed the relevant question as follows: "Are the regulations a necessary condition to determining 'whether' the GST tax applies, as petitioner contends, or do they constitute only a means of arriving at 'how' that tax, otherwise imposed by the statute, should be determined, as respondent contends." Estate of Neumann, 106 T.C. at 219. We held for the Commissioner, concluding that Congress had clearly imposed the GST tax on "direct skip" transfers by non resident aliens, thus resolving the "whether" question. Congress had authorized the issuance of regulations, we concluded, simply to address a "how" question, namely, how to fill possible gaps flowing from the fact that "not all the property of nonresident aliens is subject to U.S. estate tax." Id. at 221. Because none of those gaps complicated the GST calculation in Estate of Neumann, we held section 2663(2) to be self-executing in the absence of regulations. Id. at 222.[5]

_____

[5]Other courts have employed the "whether/how" approach when considering taxpayer-unfriendly statutes. See, e.g., Sundance Helicopters, Inc. v. United States, 104 Fed. Cl. 1, 11 (2012) (holding section 4263(c), which imposes a transportation excise tax, to be self-executing in the absence of regulations). In this and other "whether/how" cases, the courts often reached their results chiefly on the basis of statutory construction, concluding that the statute by its terms made the taxpayer liable for the tax, so that the taxpayer could not wriggle out of the tax

(continued...)

On at least one occasion, an appellate court has held a Code provision for a mandatory delegation to be non-self-executing. In Hillman, 114 T.C. at 111, we considered section 469(l)(2), which provided: "The Secretary shall prescribe such regulations as may be necessary or appropriate to carry out the provisions of this section, including regulations" addressing the treatment of expenses allocable to passive or nonpassive income. Noting the statute's taxpayer-friendly nature and describing it as a "command provision" given its use of the verb "shall prescribe," we held the statute to be self-executing, rejecting the notion that "congressionally intended benefits can be withheld simply by the refusal of the Secretary to issue regulations." Id. at 113.

The U.S. Court of Appeals for the Fourth Circuit reversed. It held that neither the statute nor the legislative history "clearly express[ed] the congressional intent the * * * [petitioners] need in order to prevail." Hillman, 263 F.3d at 343.

---

[5](...continued)
by seizing on the Secretary's failure to issue regulations. See, e.g., Temsco Helicopters, 409 F. App'x at 67 (addressing section 4263(c)); Pittway Corp. v. United States, 102 F.3d 932, 935-936 (7th Cir. 1996) (holding section 4662(b)(1), which imposes an excise tax on chemicals, to be self-executing in the absence of regulations). The "whether/how" approach has also appeared in a few cases involving taxpayer-neutral statutes. See, e.g., Int'l Multifoods Corp. v. Commissioner, 108 T.C. 579, 586-588 (1997) (holding section 865(j)(1), which provided that "[t]he Secretary shall prescribe such regulations as may be necessary or appropriate to carry out the purpose of this section, including regulations * * * relating to the treatment of losses," to be self-executing in the absence of regulations).

Congress had expressed its intention that the Secretary issue regulations addressing netting of self-charged interest expenses, while adding that "[s]uch regulations may also, to the extent appropriate, identify other situations in which netting * * * [of expenses] is appropriate." H.R. Conf. Rept. No. 99-841 (Vol. II), at 147 (1986), 1986-3 C.B. (Vol. 4) 1, 147. In the Court of Appeals' view, Congress thereby indicated, "without qualification, that the Secretary has discretion to identify other situations in which offsetting * * * will be allowed," such as the situation in that case, which involved expenses for management fees. The Court of Appeals acknowledged that inability to net expenses of the sort before it might be inequitable, but concluded that "this is an inequity * * * that only Congress or the Secretary (as the holder of the delegated authority from Congress) has the authority to ameliorate." Hillman, 263 F.3d at 343.

In sum, this Court and other courts have frequently, but not always, held to be self-executing taxpayer-friendly Code provisions that include a mandatory delegation to the Secretary. One commentator has described this as "the equity approach," on the theory that "treating such delegations otherwise would inequitably deprive taxpayers of legislatively intended benefits." Grewal, supra, at 53. In several of these cases, the IRS conceded (or did not seriously dispute) that the statute was self-executing in the absence of regulations. See First Chicago Corp., 842

F.2d at 182 (noting Government's concession that section 58(h) "[was] effective ex proprio vigore"); <u>Francisco</u>, 119 T.C. at 322 (not reaching "self-executing" issue because neither party raised it on appeal); Gall, <u>supra</u>, at 422-423 (discussing <u>Estate of Maddox</u> and <u>Estate of Hoover</u>). The "whether/how" approach has been employed mainly "with respect to taxpayer-unfriendly delegations." Grewal, <u>supra</u>, at 53. In many of those cases, the central question was whether the statute by its terms made the taxpayer liable for the tax.

B.    <u>Delegations for Permissive Rulemaking</u>

The Code contains hundreds, if not thousands, of sections that authorize the Secretary to issue regulations, without directing or mandating that he do so. Commentators have described these provisions as "discretionary" or "policy" delegations, reasoning that Congress "has not framed the delegation in 'mandatory' terms, * * * but has instead left the implementation of the policy objective to the Secretary's discretion." Gall, <u>supra</u>, at 415, 426, 439 (discussing "policy delegations"); Grewal, <u>supra</u>, at 44.

Delegations of permissive or discretionary authority (discretionary delegations) appear in many verbal forms. Often Congress expresses an intention to confer discretionary authority by use of the word "may," providing that "the Secretary may prescribe regulations" or that something may happen "under such regulations

as the Secretary may prescribe." See Grewal, supra, at 64. Occasionally these are blanket authorizations for rulemaking that seem to add little to the Secretary's existing authority under section 7805(a). More commonly, Congress authorizes the Secretary to prescribe regulations governing the availability of a particular tax treatment.

Discretionary delegations often arise in Code sections that set forth a definite requirement but allow for the possibility of exemptions. For example, section 5051 imposes an excise tax on beer, but section 5053 authorizes various exemptions "under such regulations * * * as the Secretary may * * * prescribe."[6] Section 6111 requires the disclosure of certain reportable transactions, but section 6111(c)(2) provides that "[t]he Secretary may prescribe regulations which provide * * * exemptions from the requirements of this section." Section 3402(n) provides that withholding shall not be required "if there is in effect * * * a withholding

---

[6]See sec. 5053(a) (providing for exemption for export "under such regulations, and on the giving of such notices, entries, and bonds and other security, as the Secretary may by regulations prescribe"); sec. 5053(c) (providing for exemption for removal for laboratory analysis "subject to such limitations and under such regulations as the Secretary may prescribe"); sec. 5053(f), (g), and (h) (providing for other exemptions "[s]ubject to such regulations as the Secretary may prescribe"); cf. sec. 5852(f) (providing that no firearm may be exempt from tax except "pursuant to an application in such form and manner as the Secretary may by regulations prescribe").

exemption certificate (in such form and containing such other information as the Secretary may prescribe)."

Another common type of discretionary delegation authorizes the Secretary to implement elections. For example, section 1033(g)(3)(A) provides that a taxpayer may elect, "at such time and in such manner as the Secretary may prescribe," to treat certain property as real property for involuntary-conversion purposes. Section 169(b), mentioned supra p. 25, provides that a taxpayer may elect to amortize pollution control facilities by filing a statement of election "in such manner, in such form, and within such time, as the Secretary may by regulations prescribe." Most recently, when enacting repeal of the TEFRA partnership regime for years after 2017, Congress provided that "[a] partnership may elect (at such time and in such form and manner as the Secretary of the Treasury may prescribe)," to have the amendments apply to pre-2018 tax years. Bipartisan Budget Act of 2015, Pub. L. No. 114-74, sec. 1101(g)(4), 129 Stat. at 638.[7]

---

[7]Numerous other election provisions include similar permissive wording. See, e.g., sec. 167(g)(8)(D) (election concerning depreciation on musical works "shall be made at such time and in such form as the Secretary may prescribe"); sec. 456(c)(1) (election to include prepaid dues income "shall be made in such manner as the Secretary may by regulations prescribe"); sec. 307(b)(2) (election concerning basis in stock rights "shall be made in such manner as the Secretary may by regulations prescribe"); sec. 953(c)(3)(C) (captive insurer may make certain election "at such time and in such manner as the Secretary may prescribe"); sec. 472(a) (providing that taxpayer may elect to use LIFO accounting by filing an application

(continued...)

Discretionary delegations also arise where Congress has enacted a default rule in the Code but authorized the Secretary to issue regulations providing for an alternative rule, such as a "safe harbor" or a rule of convenience. For example, section 1256(d)(4)(B) defines a "mixed straddle" for certain purposes as one in which each position in the straddle is clearly identified by a certain time "or such earlier time as the Secretary may prescribe by regulations." Section 2642(a)(3)(B) defines a "qualified severance" for GST tax purposes, but subparagraph (B)(iii) provides that this term also "includes any other severance permitted under regulations prescribed by the Secretary." See also sec. 453(d)(2) (providing that election out of the installment method shall be made at a specified time, "[e]xcept as otherwise provided by regulations").

Although many discretionary delegations include the words "may prescribe" or "may be prescribed," other verbal formulas exist. For example, section 6042(b)(2), governing reporting by dividend payors, provides that "dividends" do not include certain payments "to the extent provided in regulations prescribed by the Secretary." Section 6049(b)(1)(G), governing reporting by interest payors,

---

[7](...continued) "at such time and in such manner as the Secretary may prescribe"); sec. 473(d)(5) (election concerning qualified liquidation of LIFO inventories "shall be made subject to such conditions, and in such manner and form and at such time, as the Secretary may prescribe by regulation").

provides that "interest" includes certain interest not specified in the statute "to the extent provided in regulations prescribed by the Secretary." And section 465(c)(3)(D) provides that certain at-risk treatment "shall apply only to the extent provided in regulations prescribed by the Secretary."

This Court appears to have addressed on only one occasion whether a statute including a discretionary delegation is self-executing in the absence of regulations. That case, which generated a unanimous reviewed Opinion by this Court, was Alexander v. Commissioner, 95 T.C. 467 (1990), aff'd sub nom. Stell v. Commissioner, 999 F.2d 544 (9th Cir. 1993). It involved section 465(c)(3)(D), mentioned supra, which provides that certain at-risk treatment "shall apply only to the extent provided in regulations prescribed by the Secretary."

The Commissioner argued in Alexander, 95 T.C. at 471-472, adversely to his interest, that section 465(c)(3)(D) was not self-executing in the absence of regulations, which at the time had been proposed but not issued in final form. The Commissioner accordingly urged that the section 465(b)(3) at-risk rules did not apply to limit deductions of the sort petitioners claimed. Ruling on a motion for reconsideration, we agreed with the Commissioner:

> Section 465(c)(3)(D) unambiguously provides that section 465(b)(3) "shall apply only to the extent provided in regulations prescribed by the Secretary" * * * . Regulations have not been prescribed by the

> Secretary.  Accordingly, we hold that section 465(b)(3) does not apply to the activities of the limited partnerships.  [Id. at 473; fn. ref. omitted.]

We noted in Alexander that this conclusion was supported both by the statute's text and by its legislative history.  Describing the future operation of section 465(b)(3), Congress stated that forthcoming regulations "may make this provision applicable" to certain types of activities.  See id. at 473 n.7 (citing H.R. Rept. No. 95-1445, at 71 (1978), 1978-3 C.B. (Vol. 1) 181, 245).  We have consistently distinguished Alexander in subsequent opinions dealing with mandatory delegation.  See Francisco, 119 T.C. at 324 (finding Alexander "fully reconcilable with the principle that the Secretary's failure to issue regulations does not bar application of a beneficial tax statute"); Estate of Neumann, 106 T.C. at 219-220.

C.    The Statute at Hand

Under section 170(f)(8)(A), "[n]o deduction shall be allowed * * * for any contribution of $250 or more unless the taxpayer substantiates the contribution" with a CWA meeting the statutory requirements.  Section 170(f)(8)(D) provides that subparagraph (A) shall not apply to a contribution "if the donee organization files a return, on such form and in accordance with such regulations as the Secretary may prescribe, which includes the information" that a CWA is supposed to in-

clude. The question we must decide is whether subparagraph (D) is self-executing in the absence of implementing regulations.[8]

We begin as we must with the statute's text. <u>Greyhound Corp. v. Mount Hood Stages, Inc.,</u> 437 U.S. 322, 330 (1978). Subparagraph (D) provides that a donee organization may report information specified in subparagraph (B) "on such form and in accordance with such regulations as the Secretary may prescribe." The word "may" is used "to express possibility or likelihood," "to express permission," or "to express contingency." Webster's New World Collegiate Dictionary 889 (4th ed. 2010). By its terms, the delegated rulemaking authority is permissive: It grants the Secretary discretion to prescribe regulations governing this matter, but it does not mandate that he do so.

The discretionary nature of this delegated authority is underscored by comparing the text of subparagraph (D) with the text of subparagraph (E). The latter provides that "[t]he Secretary shall prescribe regulations" specifying that "some or

---

[8]Petitioner errs in asserting that our cases "have repeatedly recognized" that subparagraph (D) is self-executing in the absence of regulations. In the cases petitioner cites, we noted the existence of this provision, while explaining that the parties before us had not placed in issue any question regarding its possible application. See <u>Longino v. Commissioner</u>, T.C. Memo. 2013-80, at *26 n.16; <u>Averyt v. Commissioner</u>, T.C. Memo. 2012-198, 104 T.C.M. (CCH) 65, 67; <u>Schrimsher</u>, 101 T.C.M. (CCH) at 1331; <u>DiDonato</u>, 101 T.C.M. (CCH) at 1743; <u>Hill v. Commissioner</u>, T.C. Memo. 2004-156, 87 T.C.M. (CCH) 1451, 1452.

all of the requirements of this paragraph do not apply in appropriate cases."[9] The delegation of rulemaking authority in subparagraph (E), including the words "shall prescribe," is phrased in mandatory terms. We necessarily presume that Congress intended a different meaning in subparagraph (D) when it used the word "may" rather than "shall." Compare United States v. Monsanto, 491 U.S. 600, 607 (1989), with American Ass'n of Retired Persons v. EEOC, 823 F.2d 600, 604 (D.C. Cir. 1987).[10]

---

[9]Subparagraph (E) appears to have been designed chiefly to implement Congress' intent, clearly expressed in the legislative history, that regulations be issued clarifying the application of the CWA requirement for contributions made by payroll deduction and to donors' receipt from charities of token goods and services having de minimis value. See H.R. Conf. Rept. No. 103-213, at 564, 566- 567 (1993), 1993-3 C.B. 393, 442, 444-445. The Treasury Department issued temporary regulations and an NPRM addressing these topics on May 27, 1994, and issued final regulations on October 12, 1995, and December 16, 1996. T.D. 8544, 1994-2 C.B. 28, 873 (temporary regulations and NPRM); T.D. 8623, 1995-2 C.B. 28 (final regulations for contributions made by payroll deductions); T.D. 8690, 1997-1 C.B. 68 (final regulations regarding goods and services with insubstantial value).

[10]Other paragraphs of section 170(f) indicate that Congress used the words "shall" and "may" advisedly. Compare sec. 170(f)(2)(B), (10)(I), (12)(F) (providing that "[t]he Secretary shall prescribe such regulations" as necessary or appropriate), with sec. 170(f)(11)(H) (providing that "[t]he Secretary may prescribe such regulations" as necessary or appropriate), sec. 170(f)(12)(F) (providing that "[t]he Secretary may prescribe such regulations or other guidance which exempts" certain transactions from substantiation requirements), and sec. 170(f)(4) (providing that a remainder interest shall be valued using a 6% discount rate, "except that the Secretary may prescribe a different rate").

The legislative history shows that Congress, by phrasing this delegation of rulemaking authority in discretionary terms, intended that subparagraph (D) not be self-executing in the absence of regulations. The substantiation requirement now codified in section 170(f)(8) originated in the President's Budget Proposal for 1993, where it took the form of mandatory information reporting by donee organizations. Congress understood that donee reporting could achieve its objective only if such reports included the donors' taxpayer identification numbers; otherwise, the IRS could not associate the donee-supplied information with the taxpayers whose returns were selected for examination. Members of Congress and representatives of charitable organizations expressed concerns about this provision, on grounds of both donor privacy and the security of taxpayer information.

After many months of study and negotiations, Congress replaced the donee reporting regime proposed by the President with the CWA regime now codified in section 170(f)(8)(A). In subparagraph (D), Congress left open the possibility that donee reporting might be implemented as an alternative compliance mechanism, or as a back-up system if the CWA regime proved onerous or otherwise problematic. But Congress plainly understood that donee reporting raised serious policy questions concerning the form and manner of such reporting, which the Secretary would need to address before any such alternative could be implemented. This is a

classic example of a situation in which Congress has delegated discretionary, policy-making authority to the Secretary.[11]

In structural terms, section 170(f)(8) resembles other Code provisions that include discretionary delegations. As noted earlier, Congress often places a general rule or definite requirement in the Code but authorizes the Secretary to prescribe regulations providing for exemptions or for an alternative treatment. See supra pp. 35-38. Section 170(f)(8) follows this pattern. Subparagraph (A), captioned "General Rule," states that no deduction shall be allowed in the absence of a CWA that includes specified information. Subparagraph (D) provides that this general rule does not apply if the relevant information is supplied "on such form and in accordance with such regulations as the Secretary may prescribe." Congress anticipated that the Secretary would implement such an exception to the general rule only after resolving policy questions that had surfaced during the legislative process.

---

[11]Scholars who have studied this subject have urged that statutes embodying discretionary delegations should never be regarded as self-executing. See Gall, supra, at 426 ("[P]olicy delegations can never be self-executing; otherwise, courts could usurp the discretionary authority that was delegated to the Secretary.") (citing Alexander, 95 T.C. at 473-474); Grewal, supra, at 84-85. We need not decide this broader proposition; we hold that section 170(f)(8)(D) is not self-executing in light of the language, structure, and legislative history of this statute.

Because Congress intended that the Secretary exercise his discretion in resolving these questions, section 170(f)(8)(D) is not a statute that "can be applied without further explication in a regulation." Temsco Helicopters, 409 F. App'x at 67. The difficulty and sensitivity of these questions--chiefly involving donor privacy, the confidentiality of taxpayer information, and the risk of identity theft--have been underscored by actual experience. When proposing regulations to implement donee reporting in 2015, the Secretary expressed his conclusion that, "[i]n order to better protect donor privacy, * * * the Form 990 series should not be used for donee reporting." 80 Fed. Reg. 55803. He solicited comments concerning the need for additional guidance in light of "the potential risk for identity theft." Ibid.

The Secretary received in response 38,000 (mostly negative) comments. He thereupon withdrew the proposed regulations in their entirety, noting that commenters had "expressed significant concerns about donee organizations collecting and maintaining taxpayer identification numbers" for reporting purposes. 81 Fed. Reg. 882. If the expert agency to which Congress has delegated the relevant rulemaking authority encountered such difficulties in implementing donee reporting, a court trying to envision "phantom regulations" governing this subject would be shooting in the dark.

Petitioner has cited, and our own research has discovered, no case in which a court has held to be self-executing a Code provision containing a discretionary delegation that refers to regulations that the Secretary "may prescribe." Conversely, every judicial decision that has held a Code provision to be self-executing in the absence of regulations has involved a mandatory delegation that included the word "shall." In many of these cases we emphasized the mandatory nature of the delegation as evidenced by Congress' use of the word "shall." See Estate of Hoover, 102 T.C. at 782; Estate of Maddox, 93 T.C. at 233; First Chicago Corp., 88 T.C. at 676. On one occasion we suggested that the result might be different if Congress had instead used the word "may." See First Chicago Corp., 88 T.C. at 676 n.11.

Adopting what he calls a "plain meaning" approach, see Foley op. p. 57, Judge Foley in dissent urges that we ignore, as an inconsequential series of prepositional phrases and clauses, that portion of subparagraph (D) consisting of the words "on such form and in accordance with such regulations as the Secretary may prescribe." These words, in his view, do not link the operative effect of subparagraph (D) to the issuance of regulations, but simply authorize the Secretary to issue regulations if he wishes to do so. All that the statute supposedly requires is that a donee organization file "a return"--of any kind, at any time, and in the ab-

sence of implementing regulations--that "includes the information described in subparagraph (B)."

When construing a statute, "[i]t is our duty 'to give effect, if possible, to every clause and word'" so as to avoid rendering any part of the statute meaning-less surplusage. United States v. Menasche, 348 U.S. 528, 538 (1955) (quoting Montclair v. Ramsdell, 107 U.S. 147, 152 (1883)); Market Co. v. Hoffman, 101 U.S. 112, 115 (1879) (construing a statute so that "no clause, sentence, or word shall be superfluous, void, or insignificant"); Marbury v. Madison, 5 U.S. (1 Cranch) 137, 171 (1803) (enunciating "anti-surplusage" canon of construction). The approach of Judge Foley's dissenting opinion violates these well-established principles of statutory interpretation by rendering subparagraph (D)'s reference to regulations completely meaningless.

Section 7805(a) authorizes the Secretary to "prescribe all needful rules and regulations for the enforcement of this title." And section 170(f)(8)(E) authorizes the Secretary to prescribe "such regulations as may be necessary or appropriate to carry out the purposes of this paragraph," namely, the purposes of section 170(f)(8) generally. If the words "on such form and in accordance with such regu-lations as the Secretary may prescribe" are to have any independent significance in subparagraph (D), they must do more than simply authorize the Secretary to issue

regulations if he deems it appropriate to do so. See Williams v. Taylor, 529 U.S. 362, 404 (2000) (describing antisurplusage canon as a "cardinal principle of statutory construction"); Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 174, 176 (2012) ("[I]t is no more the court's function to revise by subtraction than by addition.").

As noted earlier, there are hundreds of Code provisions that employ phrases or clauses similar to those in subparagraph (D) to effect discretionary delegations to the Secretary. Section 5053(a), for example, dealing with the excise tax on beer, provides an exemption for export "under such regulations, and on the giving of such notices, entries, and bonds and other security, as the Secretary may by regulations prescribe." We doubt that Judge Foley's dissenting opinion would treat these prepositional phrases and clauses, or those in many similar Code sections, as meaningless verbiage. There is no logical reason why the result should be different here.

The approach in Judge Foley's dissenting opinion would also produce results plainly at odds with Congress' intent. The dissent's conclusion would allow the Trust to satisfy its obligations under section 170(f)(8) by filing an amended Form 990 six years after the LLC's 2007 tax return was due to be filed and three years after the IRS completed its examination of that return. See Foley op. p. 58.

This action by a donee organization clearly fails to advance either of the purposes Congress enunciated when enacting section 170(f)(8), namely, "to assist taxpayers in determining the deductible amounts of their charitable contributions" or "to assist the Internal Revenue Service in processing tax returns on which charitable contribution deductions are claimed." Durden, 103 T.C.M. (CCH) at 1763. In effect, the dissent would make subparagraph (A) elective with charities, an outcome that Congress can scarcely have envisioned when it enacted the CWA regime as a tax compliance measure.

In sum, we conclude that section 170(f)(8)(D) sets forth a delegation of discretionary rulemaking authority. The statute authorizes, but does not command, the Secretary to implement a donee reporting regime as an alternative compliance mechanism to the CWA regime embodied in subparagraph (A). The statute thus commits to the Secretary's discretion whether a regime for donee reporting should be implemented and (if so) how.

In the exercise of his discretion, the Secretary determined in 1997, and again in 2016, that a system of donee reporting is neither necessary nor desirable, and he accordingly declined to issue the regulations that the statute says he "may prescribe." We hold that subparagraph (D) is not self-executing and that it has no operative effect in the absence of the regulations to which the statute refers. The re-

quirements of subparagraph (A) therefore remain fully applicable to petitioner's 2007 gift, notwithstanding the Trust's filing in 2014 of an amended return including the information described in subparagraph (B).[12]

To reflect the foregoing,

An order will be issued denying petitioner's motion for partial summary judgment.

GALE, THORNTON, GOEKE, HOLMES, KERRIGAN, BUCH, NEGA, and ASHFORD, JJ., agree with this opinion of the Court.

MARVEL and PUGH, JJ., concur in the result only.

---

[12]Because section 170(f)(8)(D) embodies a discretionary delegation, we need not address questions that would arise under our case law if we were considering a statute that embodied a mandatory delegation. Reasonable minds can differ, for example, as to whether the statute before us is "taxpayer friendly" or "Government friendly." On the one hand, implementation of subparagraph (D) would relieve the taxpayer of a substantiation obligation otherwise required. On the other hand, subparagraph (D) is part of "a compliance provision," Viralam, 136 T.C. at 171, that Congress expected to raise substantial revenue by deterring taxpayers from claiming inflated charitable contribution deductions. Reasonable minds can also differ as to where this statute would fall on the "whether/how" continuum. Subparagraph (D) arguably displays aspects of both. By authorizing the Secretary to specify the form and manner of donee reporting, the statute addresses "how" questions. But it also delegates the Secretary authority to address difficult policy questions, the resolution of which may affect (and did affect) his decision as to whether donee reporting should be implemented at all. In view of our disposition, it is unnecessary to tread further into these waters.

HOLMES, J., concurring:  I fully agree with the opinion of the Court, but write separately to highlight an interesting aspect of this case--yet another instance of tax law's wandering away from general principles of administrative law.

Courts frequently face the problem of what to do with an agency that has ignored Congress's invitation or command to write regulations.  Should a court remedy the agency's refusal to exercise the power delegated to it, and if so, how?  This is a practical question that some academics have actually given some considered thought to; and Professor Grewal has concluded, after a thorough review I won't cut and paste here, that to hold a statute self-executing and invoke "phantom regulations"--a court's best guess at what regulations an agency might have issued--is never an appropriate response.  See Amandeep S. Grewal, "Substance Over Form? Phantom Regulations and the Internal Revenue Code," 7 Hous. Bus. & Tax L.J. 42, 45-46 (2006).  I recognize that this is likely a minority position, but some pioneering dissenters preceded the professoriate:  The role of the courts "is to interpret, not make, the law," and "this Court cannot divine what rules the Secretary would promulgate."  Francisco v. Commissioner, 119 T.C. 317, 336 (2002) (Foley, J., dissenting), aff'd, 370 F.3d 1228 (D.C. Cir 2004).

But I also recognize that this isn't a position that we need to reexamine today.  As the Court correctly concludes, section 170(f)(8)(D) is a discretionary

delegation to the Secretary and has no operative effect without the suggested regulations.  See op. Ct. p. 50.  When delegated authority is discretionary, it's within the agency's discretion, not the Court's, to draft regulations or to decide whether to issue regulations at all.[1]  Once we decide that the text of the Code requires such regulations, that's enough to decide this case.[2]

But delegations from Congress can also be mandatory.  Mandatory delegations are usually indicated by a command that the agency "*shall* issue regulations."  Grewal, supra at 43-44.  Our current caselaw has created a series of imprecise tests for how to apply the Code when the Secretary fails to heed Congress's mandate to issue regulations.  We have the legislative-history approach, where we "delve[] into extra-statutory sources to determine legislative

---

[1]See Norton v. S. Utah Wilderness All., 542 U.S. 55, 64 (2004) (holding that a court can only compel an agency to act if the agency "failed to take a *discrete* agency action that it is *required to take*"); Benzman v. Whitman, 523 F.3d 119, 131 (2d Cir. 2008) (refusing to compel the EPA to act because the regulations governing the EPA actions at issue were discretionary).  And sometimes Congress gives an agency even greater latitude by saying, for example, that it may act "by regulation or other guidance."  The majority carefully notes a couple instances of this, see op. Ct. note 10, within section 170(f) itself.  All of this shows that Congress knows how to tell an agency exactly what it wants it to do--and how.

[2]Though even in a case like this, I would note that a taxpayer who disagrees with Treasury's inaction could try to seek relief under the APA, which requires agencies to "give an interested person the right to petition for the issuance, amendment, or repeal of a rule."  5 U.S.C. sec. 553(e); see Grewal, supra at 84-85.  Denial of a taxpayer's petition is then appealable to the courts.  5 U.S.C. secs. 702, 706 (2012); see Auer v. Robbins, 519 U.S. 452, 459 (1997).

intent." Grewal, supra, at 49-50; see Int'l Multifoods Corp. v. Commissioner, 108 T.C. 579, 586 (1997). If we find in the entrails of committee reports, floor statements, and Blue Books what sort of regulations Congress wanted, then we say that the statute is self-executing. See, e.g., Hillman v. Commissioner, 114 T.C. 103, 108-12 (2000), rev'd, 263 F.3d 338 (4th Cir. 2001). We have the "equity" approach, where we declare that a taxpayer-friendly statute must be self-executing in the name of fairness because the Secretary shouldn't be allowed to subvert the will of Congress by not issuing regulations. See Francisco, 119 T.C. at 324; Grewal, supra, at 47, 53. And we have the whether-how approach, where we try to figure out if Congress gave the Secretary the power to decide *whether* a result should occur or merely *how* that result should occur. See Grewal, supra, at 47, 55. Only if the answer is *how* will we deem the Code section at issue to self-execute (or, more precisely, come up with regulation-like rules ourselves). See, e.g., Estate of Neumann v. Commissioner, 106 T.C. 216, 221 (1996).

But we've built up this body of tax law in apparently blissful disregard for the APA, which provides a generally applicable procedure to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. sec. 706(1) (2012). Outside the tax realm, courts frequently entertain section 706(1)

arguments against agency inaction.[3]  When Congress tells an agency that it shall issue regulations, it is a command to the *agency*, and not a court, to issue regulations.  It is also a command to the agency to act by "regulation"--a term with a fixed meaning in administrative law and one that usually means that a regulation has to run through the normal APA rulemaking gauntlet.  That procedure includes providing public notice of a proposed regulation, giving interested people the opportunity to comment, and explaining the basis and purpose of the regulation.  See id. sec 553; Kristin E. Hickman, "Coloring Outside the Lines: Examining Treasury's (Lack of) Compliance with Administrative Procedure Act Rulemaking Requirements," 82 Notre Dame L. Rev. 1727, 1732 (2007).  When we hold a Code section that tells the Secretary to issue regulations to be self-executing, we arrogate to ourselves what belongs to the Secretary.  It is simply not up to us to act as an agency.

The Supreme Court has warned that "we are not inclined to carve out an approach to administrative review good for tax law only".  Mayo Found. for Med. Educ. & Research v. United States, 562 U.S. 44, 55 (2011).  We have not been

---

[3]See e.g., Prometheus Radio Project v. FCC, 824 F.3d 33, 49-50 (3d Cir. 2016) (using 5 U.S.C. section 706(1) to order the Federal Communications Commissioner to update regulations defining an eligible entity); Kingsbrook Jewish Med. Ctr. v. Richardson, 486 F.2d 663, 670 (2d Cir. 1973) (using 5 U.S.C. section 706(1) to compel the Secretary of Health, Education, and Welfare to issue regulations about Medicare retroactive corrective rate adjustments).

asked to reconsider our caselaw on phantom regulations here.  But when we are, I will be receptive to doing so.

FOLEY, J., dissenting:  This case should be decided on the plain and unambiguous language of the statute.  See Harris Trust & Sav. Bank v. Salomon Smith Barney, Inc., 530 U.S. 238, 254 (2000) ("[A]s in any case of statutory construction, our analysis begins with the language of the statute . . . . And where the statutory language provides a clear answer, it ends there as well."  (quoting Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 438 (1999))).  The majority, however, without establishing or even asserting that section 170(f)(8)(D) is ambiguous, focuses on legislative history, regulatory history, and caselaw relating to mandatory and permissive delegations of regulatory authority.

Section 170(f)(8)(D) provides that "[s]ubparagraph (A) shall not apply to a contribution if the donee organization files a return, on such form and in accordance with such regulations as the Secretary may prescribe, which includes the information described in subparagraph (B) with respect to the contribution." (Emphasis added.)  The first clause establishes whether section 170(f)(8)(A) applies when the donee organization files a return, and the second clause merely establishes that the Secretary may provide alternative rules detailing how a donee organization may file such a return.[1]  See Estate of Neumann v. Commissioner,

---

[1]The heading of the subparagraph in question, "[s]ubstantiation not required for contributions reported by the donee organization", further indicates that sec. 170(f)(8)(D) is effective regardless of whether regulations are promulgated.  See

(continued...)

106 T.C. 216, 219 (1996). The Secretary's failure to create such rules and issue new forms, however, does not render section 170(f)(8)(D) inoperative. Indeed, "[w]e have frequently held that the Secretary may not prevent implementation of a tax benefit provision simply by failing to issue regulations." Francisco v. Commissioner, 119 T.C. 317, 324 (2002), aff'd, 370 F.3d 1228 (D.C. Cir. 2004); see also Estate of Maddox v. Commissioner, 93 T.C. 228, 233-234 (1989); First Chicago Corp. v. Commissioner, 88 T.C. 663, 676-677 (1987), aff'd, 842 F.2d 180 (7th Cir. 1988); Occidental Petroleum Corp. v. Commissioner, 82 T.C. 819, 829 (1984). In the absence of regulations from the Secretary, a donee filing a return that contains the information described in section 170(f)(8)(B) satisfies the requirements of section 170(f)(8)(D).

The language "files a return, on such form and in accordance with such regulations as the Secretary may prescribe" is found in only one place in title 26, section 170(f)(8)(D). Thus, it must be analyzed according to its unique terms. In section 170(f)(8)(D) "files a return" is immediately followed and modified by the prepositional phrase "on such form and in accordance with such regulations as the

[1](...continued)
Almendarez-Torres v. United States, 523 U.S. 224, 234 (1998) ("'[T]he title of a statute and the heading of a section' are 'tools available for the resolution of a doubt' about the meaning of a statute." (quoting Trainmen v. Balt. & Ohio R.R. Co., 331 U.S. 519, 528-529 (1947))).

Secretary may prescribe". This phrase does not modify "[s]ubparagraph (A)".

"Subparagraph (A)" is immediately followed and limited in scope by the verb phrase "shall not apply to a contribution". The majority's analysis simply ignores the statutory command that "[s]ubparagraph (A) shall not apply to a contribution" and in essence reconstructs section 170(f)(8)(D) to state: "Under regulations prescribed by the Secretary, subparagraph (A) may not apply to a contribution". Our role, however, is to review and construe, not adjust and reconstruct, the statute. See Dodd v. United States, 545 U.S. 353, 359 (2005) (stating that courts "are not free to rewrite the statute that Congress has enacted"). Inexplicably, the majority's analysis relegates to mere surplusage and simply ignores the statutory command that "[s]ubparagraph (A) shall not apply to a contribution".[2]

---

[2]Curiously, the majority contends that my reading of sec. 170(f)(8)(D) renders the phrase "on such form and in accordance with such regulations as the Secretary may prescribe" surplusage. See op. Ct. p. 48. That contention should not, however, override the plain meaning of sec. 170(f)(8)(D). See Moskal v. United States, 498 U.S. 103, 120 (1990) (Scalia, J., dissenting) ("The principle [against mere surplusage] is sound, but its limitation ('if possible') must be observed. It should not be used to distort ordinary meaning."). Indeed, sec. 7805(a) and its predecessors have granted the Secretary the general authority to promulgate regulations since 1916, yet Congress has regularly included the Secretary's authority to promulgate regulations in various other Code sections. See, e.g., secs. 338(i), 472(a), 1256(d)(2), 1502, 5053. Certainly, each of these specific grants of regulatory authority has an independent effect beyond sec. 7805(a) and is not dismissed as surplusage.

The majority acknowledges that "the donee reporting provision received little attention". See op. Ct. p. 13. Indeed the only legislative history relating directly to section 170(f)(8)(D) is a statement in the conference report that

> [s]ubstantiation is not required if the donee organization files a return with the IRS (in accordance with Treasury regulations) reporting information sufficient to substantiate the amount of the deductible contribution.

H.R. Conf. Rept. No. 103-213, at 565 (1993), 1993-3 C.B. at 443. This statement is consistent with the unambiguous language of the statute. The majority fails to cite anything that establishes Congressional intention to cede to Treasury the authority to determine whether section 170(F)(8)(D) will be applicable. In a valiant attempt to legitimize a holding not supported by the statute, the majority is compelled to rely on regulatory history relating to regulations that were never promulgated and legislative history (i.e., pledges from Treasury officials who served in a previous Administration, a hearing statement from a congressman who retired before section 170(f)(8)(D) was enacted, etc.) relating to a bill vetoed during a previous Congress. In short, the majority pays great attention to the wrong details.

COLVIN, VASQUEZ, GUSTAFSON, PARIS, and MORRISON, JJ., agree with this dissent.

GUSTAFSON, J., dissenting: Section 170(f)(8)(A) provides the general rule for substantiation of a charitable contribution by a "contemporaneous written acknowledgment"; and section 170(f)(8)(D) provides this alternative:

> (D) *Substantiation not required for contributions reported by the donee organization*.-- Subparagraph (A) shall not apply to a contribution if the donee organization files <u>a return, on such form and in accordance with such regulations as the Secretary may prescribe,</u> which includes the information described in subparagraph (B) with respect to the contribution. [Emphasis added.]

I would hold that petitioner's donee organization successfully employed this alternative when it filed its amended Form 990, "Return of Organization Exempt from Income Tax". In holding otherwise, the majority opinion makes a simple misreading of the phrase in (f)(8)(D) referring to "regulations". This misreading appears no later than the headnote, which observes that "the Secretary has not issued <u>regulations to implement the donee-reporting regime</u> referred to in subparagraph (D)." <u>See</u> op. Ct. p. 1 (emphasis added). Strictly speaking, this observation is correct; but in fact the statute makes no mention of regulations to implement such a regime.[1]

---

[1]Had Congress conceived the rule that the opinion assumes, the phrase "which includes" might have been moved and the statute might have read--

> *Subparagraph (A) shall not apply to a contribution if the donee organization files a return which <u>includes, on such form and in accordance with such regulations as the Secretary may prescribe, the</u>*

(continued...)

Rather, the statute provides that subsection (f)(8)(A) will not apply "if the donee organization files a return, on such form and in accordance with such regulations as the Secretary may prescribe".  (Emphasis added.) (The statute then adds the condition that the return must "include[] the information described in subparagraph (B)".)  Thus, the only regulation referred to in the statute (and the only regulation that could be argued as being required by the statute) is a regulation providing for "a return" to be filed by a donee organization.

For tax-exempt charitable organizations,[2] the regulations already did (and still do) prescribe a "return"--i.e., Form 990, "Return of Organization Exempt from Income Tax":

§ 1.6033-2.  Returns by exempt organizations * * *

(a)    In general.--(1)  * * * [E]very organization exempt from taxation under section 501(a) shall file an annual information return

---

[1](...continued)
*information described in subparagraph (B) with respect to the contribution.*

A hypothetical statute worded thus might support the argument that the donee-reporting regime itself was to be the subject of regulations.  But instead, in the statute as actually enacted, the only subject of regulations is the "return".

[2]Not all organizations that may be the donees of deductible charitable contributions must file returns.  See, e.g., sec. 170(c)(1) ("A State, a possession of the United States, * * * or the United States or the District of Columbia").  However, at least some tax-exempt organizations not required to file Form 990 may file it voluntarily.  See Rev. Rul. 71-55, 1971-1 C.B. 403.

specifically setting forth its items of gross income, gross receipts and disbursements, and such other information as may be prescribed in the instructions issued with respect to the return * * *.

(2)(i) * * * [E]very organization exempt from taxation under section 501(a), and required to file a return under section 6033 and this section ... shall file its annual return on Form 990. * * *

(ii) The information generally required to be furnished by an organization exempt under section 501(a) is: * * *

(f) The total of the contributions, gifts, grants and similar amounts received by it during the taxable year, and the names and addresses of all persons who contributed, bequeathed, or devised $5,000 or more (in money or other property) during the taxable year. * * * [Emphasis added.]

As the Commissioner has acknowledged on brief: "The legislative history suggests that, when Congress referred to 'return,' it meant the return under section 6033" (citing H.R. Conf. Rept. No. 103-213, at 563 (1993), 1993-3 C.B. 393, 441 ("Tax-exempt organizations generally are required to file an annual information return (Form 990) with the IRS")). And on that Form 990, donee organizations have long been able (and still are able) to report information about donors and donations:

As in effect in 1992--i.e., before the legislative initiative described in the opinion of the Court--the Form 990 had no prescribed schedule for identifying donors, but the instructions for Form 990 stated (at 8):

**Line 1d-- Total contributions, etc.**-- Enter the total of amounts reported on lines 1a through 1c.

**Attached schedule.**-- *Schedule of contributors* (not open to public inspection)

**Caution:** See Note (2) below.

Attach a schedule listing contributors who gave the organization, directly or indirectly, money, securities, or other property worth $5,000 or more during the year. If no one contributed the reportable minimum, the organization does not need to attach a schedule. Show each contributor's name and address, the total amount received, and the date received. Contributors include individuals, fiduciaries, partnerships, corporations, associations, trusts, or exempt organizations. * * *

**Note (2): Caution:** *If the organization files a copy of Form 990 and attachments with any state, do not include, in the attachments for the state, the schedule of contributors discussed above, unless the schedule is specifically required by the state with which the organization is filing the return. States that do not require the information might nevertheless make it available for public inspection along with the rest of the return.*

Thus, under the status quo before the enactment of section 170(f)(8), an exempt organization would--without using any explicitly prescribed schedule--compose its own schedule to give some donor information on its Form 990 information return.

When section 170(f)(8)(D) was enacted, the tax-exempt charity's "return, on such form and in accordance with such regulations as the Secretary may prescribe", was already prescribed as Form 990, and the explicitly authorized

practice was for the organization to compose its own schedule giving donor information.

By 2007, the IRS had prescribed a Schedule B, "Schedule of Contributors". However, Schedule A, part III, line 3c asked--

> Did the organization receive or hold an easement for conservation purposes, including easements to preserve * * * historic structures? If "Yes," attach a detailed statement

--and the "detailed statement" was, again, to be composed by the organization.  It was in such a "detailed statement" attached to its Form 990 that petitioner's donee organization "include[d]", in compliance with subsection (f)(8)(D), the information required by paragraph (B)--i.e., on "a return, on such form and in accordance with such regulations as the Secretary may prescribe", to wit, Form 990.

When it applies, section 170(f)(8)(A) requires a "contemporaneous" receipt from the donor organization.  On the one hand, in certain respects the statute is not very demanding.  For example, there is no requirement that anyone sign the receipt, and this Court's experience is that such receipts often bear neither a signature nor even an individual's name.  On the other hand, if the donee organization fails to comply in any respect with what the statute does require,[3]

---

[3]A deduction will be disallowed if the receipt is issued after the donee's tax

(continued...)

then that failure strictly defeats an otherwise valid deduction, even if the donor is fully capable of substantiating the fact and amount of the donation. If section 170(f)(8)(A) were viewed by itself, this selective strictness might seem strange. Section 170(f)(8)(D), however, has the effect of providing an alternative that may save the otherwise defeated contribution deduction.[4]

Admittedly, section 170(f)(8)(D) gives the Secretary the power to promulgate additional regulations and specific forms or schedules for the reporting of contributions on a donee's return--a power the Secretary has not explicitly

---

[3](...continued)
return is filed or is due, sec. 170(f)(8)(C), of if the receipt fails to state an amount of a cash contribution or a description (but not a value) of a non-cash contribution, sec. 170(f)(8)(B)(i), or lacks a statement whether the donee provided goods or services and a statement of the value of those goods or services, sec. 170(f)(8)(B)(iii).

[4]The majority suggests, see op. Ct. p. 49, that this interpretation "would make subparagraph (A) elective with charities," but in fact the alternative in section 170(f)(8)(D) is significantly more demanding than the contemporaneous receipt that satisfies subsection (f)(8)(A). This alternative substantiation must be made on the Form 990 return (not a mere receipt) and thus is potentially subject to civil penalties under section 6701 and, since the return is signed "[u]nder penalties of perjury", the criminal penalties of section 7206(1) as well. In addition, an organization that decided not to issue receipts would surely disappoint and confuse its donors--not a good thing for an organization that depends on donations. It would therefore seem unlikely that an organization would elect not to issue receipts but instead to report its contributions on its return.

exercised. But contrary to the Commissioner's position[5] and the majority's holding, a donee's compliance with section 170(f)(8)(D) did not require the Secretary to promulgate any additional regulations,[6] since the existing regulations prescribed for donees that are exempt from tax under section 501(c)(3) a return-- Form 990--and thereby gave such donees an occasion to "include[] the information described in subparagraph (B)" on that return.[7] The statutory text shows no reason

---

[5]See "Respondent's Response to Petitioner's Motion for Partial Summary Judgment", at 13-16 (Aug. 15, 2014). Neither the Commissioner nor the majority suggests that this Court is bound to defer to this agency position (which has never been promulgated in a regulation). We therefore construe the statute by normal principles.

[6]Cf. Francisco v. Commissioner, 119 T.C. 317, 323-324 (2002) ("Section 931(d)(2) * * * is silent as to whether those regulations may be issued under section 931 or another section of the Code, such as sections governing the determination of sources of income (sections 861-865). In the absence of regulations under section 931(d)(2), we believe it is appropriate to consider sections 861-865 and related regulations"), aff'd, 370 F.3d 1228 (D.C. Cir. 2004).

[7]The information that section 170(f)(8)(D) requires a donee's return to report is "the information described in subparagraph (B)" of section 170(f)(8); and that "information" does not include the donor's social security number nor even his address. The majority, see op. Ct. p. 22 (citing 80 Fed. Reg. 55804), shows that the Department of the Treasury once envisioned a more ambitious regime that would have required not only information required in the statute but more--i.e., "[t]he donor's taxpayer identification number * * * in order to properly associate the donation information with the correct donor." However, since Treasury declined to set up such a system (because of "the potential risk for identity theft"), we need not speculate about the validity of such extra-statutory requirements if Treasury were ever to promulgate such regulations. At present it is sufficient to note that a donee organization filing Form 990 is currently able to comply with

(continued...)

that the Department of the Treasury should be able to veto this alternative by declining to promulgate additional regulations.

Nor does the legislative history suggest such a de facto veto power. That history, as described by the majority, see op. Ct. pp. 12-18, shows that Congress once considered but did not enact mandatory donee reporting as the primary substantiation of charitable contributions, and that the notion of donee reporting survives in section 170(f)(8)(D) as a non-mandatory alternative. That history provides no basis whatsoever for the idea that the actually enacted alternative cannot be employed until the IRS promulgates new regulations.

The Tax Court should not give to Treasury the power to veto section 170(f)(8)(D) by regulatory inaction--a power that Congress did not grant-- and thereby deprive taxpayers of a means that Congress did grant.

COLVIN, FOLEY, VASQUEZ, PARIS, and MORRISON, JJ., agree with this dissent.

---

[7](...continued)
section 170(f)(8)(D) by providing "the information described in subparagraph (B) with respect to the contribution".