Charles H. ADDIS; Cindi Addis,
Petitioners–Appellants,

v.

COMMISSIONER OF INTERNAL
REVENUE, Respondent–
Appellee.

No. 02–73628.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 25, 2004.

Filed July 8, 2004.

Steven Toscher, Hochman, Salkin, Rettig, Toscher & Perez, P.C., Beverly Hills, CA, for the petitioners-appellants.

Steven W. Parks, Attorney, Tax Division, Department of Justice, Washington, DC, for the respondent-appellee.

Before CANBY, NOONAN, and THOMAS, Circuit Judges.

NOONAN, Circuit Judge.

Charles H. Addis and his wife Cindi Addis appeal a Tax Court judgment denying them charitable contribution deductions for their payments to the National Heritage Foundation ("NHF") in 1997 and 1998. The central question is whether 26 U.S.C. § 170(f)(8) disallows the deductions because the receipts substantiating the transfers to the NHF stated the Addises received no consideration though they expected the NHF to use their funds to pay part of the premiums on life insurance benefitting their trust pursuant to a split-dollar arrangement. We hold that section 170(f)(8) bars the deductions and affirm the decision of the Tax Court.

## FACTS

Charles Addis is a farm labor contractor and his wife Cindi Addis is a bookkeeper. They are the initial trustees and beneficiaries of the Charles H. Addis Family Trust, which they created on May 7, 1986. On the couple's deaths, the trust benefits their family members.

The NHF is a tax-exempt organization under 26 U.S.C. § 501(c)(3) and is eligible to receive tax-deductible contributions under 26 U.S.C. § 170 if tax code requirements are satisfied.

The questions we consider arise from the Addises' attempts to claim charitable contribution deductions for payments to the NHF in connection with a "charitable split-dollar" arrangement. "In general, a charitable split-dollar insurance transaction involves a transfer of funds by a taxpayer to a charity, with the understanding that the charity will use the transferred funds to pay premiums on a cash value life insurance policy that benefits both the charity and the taxpayer's family." I.R.S. Notice 99–36, 1991–1 C.B. 1284.

*The split-dollar agreement*

On October 10, 1997, Charles Addis wrote NHF president Dr. J.T. Houk stating the Addis trust was going to obtain life insurance on Cindi Addis and offering the NHF the option of buying an interest in the policy. Charles Addis wrote: "The premium for National Heritage Foundation's interest under the option is $36,000.00 a year for 12 years."

On October 15, 1997, the NHF and Charles Addis, in his capacity as trustee, entered an agreement governing the NHF's option of buying policy benefits from the Addis trust. The same day, Commercial Union Life Insurance Company issued a policy on Cindi Addis, then 44, to Charles Addis in his capacity as trustee. The initial death benefit was $991,789. The planned annual premium was $40,000.

Under the split-dollar agreement, the NHF had the option of paying $36,000— 90% of the planned annual premium—for a "planned premium period" of twelve years. The NHF would then be entitled to $557,-280—about 56% of the initial death benefit—if Cindi Addis died. The NHF's share of the death benefit was fixed even if the death benefit increased in value, as projected.

If the policy was surrendered and the NHF had made all its premium payments, the NHF would be entitled to its "termination account value"—the aggregate of all the premiums it had paid over the years minus the "cost" of its share of the death benefit measured using a factor set by the agreement called the "annual renewable term (ART)" rate.

Though the agreement contemplated payments by the NHF for twelve years, the NHF could opt to not pay all or any part of its premium portion. Depending on the shortfall and amount of prior payments, the NHF's benefits might be curtailed. Because the NHF used the Addises' $36,000 transfers to pay policy premiums in each of the tax years at issue, we discuss only the provisions that govern if the NHF paid its full portion.

Under the split-dollar agreement, the Addis trust would pay only 10% of the planned annual premium but be entitled to about 44% of the initial death benefit plus the projected increases in the death benefit over the years. The Addises retained the sole right to borrow on the policy or surrender the policy. If the Addises surrendered the policy, the Addis trust owned the net cash surrender value less the NHF's termination account value.

If the policy death benefit fell below the amount sufficient to give the NHF its share of the death benefit, the Addis trust would pay the shortfall. Similarly, if the policy's net surrender value proved insufficient to provide the NHF with the amount to which it was entitled on surrender, the Addis trust would pay the shortfall.

Insurance marketer Lawrence D. Cronin testified: "The Addis case was actually the first case that we ever sold" involving

the split-dollar concept. NHF President Houk testified that about 600 to 700 of the more than 4,500 foundations under the NHF aegis were based on similar split-dollar arrangements.

*The money transfers by the Addises, premium payments by the NHF, and charitable contribution deduction claims*

The same day that Charles Addis wrote to Houk proposing the split-dollar arrangement, the Addises paid $285 to the NHF to establish a charitable foundation under the NHF umbrella. The NHF sent the Addises a plaque and operations manual, as was the organization's practice with new foundations.

About a month after the NHF and the Addis trust entered the split-dollar agreement, the Addises sent a $36,000 check dated November 13, 1997 to the NHF. Charles Addis's cover letter stated in part:

> I am expecting you will use my donation to pay the premiums on the policy payable to my foundation. Although I realize you are under no obligation to do so, I request that you use my donation for that purpose.

In another check, also dated November 13, 1997, the Addises paid Commercial Union Life their premium portion of $4,000.

Charles Addis acknowledged in testimony before the Tax Court that the Addises expected the NHF to use their money to pay premiums pursuant to the split-dollar option agreement. Charles Addis explained that "they said they were going to make the payments." Charles Addis testified that if the NHF did not make the premium payments, "we would, obviously, contact them and say, why not, and if we weren't satisfied, we'd quit giving them money."

On November 19, 1997, the NHF credited the Addis Family Foundation with the Addises' $36,000 transfer, then debited the Addis account the same day to reflect that the $36,000 was sent to Commercial Union Life Insurance Company. The NHF's receipt substantiating the Addises' payment stated: "In accordance with IRS regulations, the National Heritage Foundation did not provide any goods or services to the donor in return for the contribution."

The Addises claimed a $36,285 charitable contribution deduction on their 1997 tax return for their transfer of funds to the NHF.

In October 1998, the Addises again made a $36,000 payment to the NHF and sent $4,000 to Commercial Union. The NHF again credited the Addis Family Foundation with $36,000 and debited the Addis account on the same day to reflect that the Addises' money was forwarded to Commercial Union. The NHF receipt substantiating the Addises' payment stated: "NHF did not provide any goods or services to the donor in return for the contribution."

The Addises claimed a $36,000 charitable contribution deduction on their 1998 tax return for their transfer of funds to the NHF.

The NHF ceased engaging in split-dollar arrangements after Congress in 1999 enacted 26 U.S.C. § 170(f)(10), which disallows deductions when an organization uses transferred funds to pay premiums on life insurance "with respect to the transferor" and levies a 100% excise tax on the premium payments. *See* Ticket to Work and Work Incentives Improvement Act of 1999, § 537, Pub.L. 106–170, § 537, 113 Stat. 1860, 1936. The Senate report regarding section 170(f)(10) characterized charitable split-dollar arrangements as "an abuse of the charitable contribution deduction" where, "[i]n substance, the charity receives a transfer of a partial interest in an insurance policy, for which no charitable contri-

bution deduction is allowed." S.Rep. No. 106–201, at 42 (1999). The denial of a deduction in section 170(f)(10) was intended to be a clarification and restatement of preexisting law: "While there is no basis under present law for allowing a charitable contribution deduction in these circumstances," section 170(f)(10) was enacted to "stop the marketing of these transactions immediately." *Id.*

## PROCEEDINGS BELOW

On March 20, 2000, the Addises received a notice of deficiency in their 1997 and 1998 federal income taxes due to the disallowance of the charitable contribution deductions they claimed for their transfers to the NHF. The notice stated that the Addises owed $13,062 for the 1997 tax year and $12,960 for the 1998 tax year.

The Addises petitioned the Tax Court for a redetermination. The Tax Court ruled that the deductions were disallowed by 26 U.S.C. § 170(f)(8) because the Addises' contemporaneous substantiation of their payments to the NHF inaccurately stated they received no consideration in exchange and did not reveal that they expected the NHF to use their funds to pay premiums on life insurance benefitting them in part. *Addis v. Comm'r*, 118 T.C. 528, 536–37, 2002 WL 1284945 (2002). The Tax Court found that

> Petitioners and NHF designed a scheme purporting to provide no benefits to petitioners in exchange (or consideration) for petitioners' payments. However, petitioners received substantial benefits from NHF under the life insurance policy.... [P]etitioners expected, and they told NHF that they expected, NHF to use their contributions for both their and NHF's benefit.

*Id.* at 536. The Tax Court did not reach the question of whether the deductions were also disallowed under 26 U.S.C.

§ 170(f)(3) because, in substance, the Addises had contributed a partial interest to the NHF.

The Addises appeal.

## ANALYSIS

*The consideration disclosure requirement*

"[O]ur tax structure is based on a system of self reporting." *United States v. Bisceglia*, 420 U.S. 141, 145, 95 S.Ct. 915, 43 L.Ed.2d 88 (1975). "There is legal compulsion, to be sure, but basically the Government depends upon the good faith and integrity of each potential taxpayer to disclose honestly all information relevant to tax liability." *Id.*

The tax code provision we apply, 26 U.S.C. § 170(f)(8), aids in effective administration of the self-reporting and self-assessment system. Section 170(f)(8) provides in relevant part:

> (A) General rule.—No deduction shall be allowed under subsection (a) for any contribution of $250 or more unless the taxpayer substantiates the contribution by a contemporaneous written acknowledgment of the contribution by the donee organization that meets the requirements of subparagraph (B).
>
> (B) Content of acknowledgment.—An acknowledgment meets the requirements of this subparagraph if it includes the following information:
>
> (i) The amount of cash and a description (but not value) of any property other than cash contributed.
>
> (ii) Whether the donee organization provided any goods or services in consideration, in whole or in part, for any property described in clause (i)
>
> (iii) A description and good faith estimate of the value of any goods or services referred to in clause (ii) or, if such goods or services consist solely of intan-

gible religious benefits, a statement to that effect.

26 U.S.C. § 170(f)(8). Congress enacted section 170(f)(8) to increase compliance with the rule that "where a charity receives a quid pro quo contribution (i.e, a payment made partly as a contribution and partly in consideration for goods or services furnished to the payor by the donee organization)," a charitable contribution deduction is limited to the amount exceeding the value of the consideration received. H. Rep. 103–111, at 785 (1993). Section 170(f)(8) "does not impose an information reporting requirement upon charities; rather it places the responsibility upon taxpayers ... to request ... substantiation from the charity of their contribution (and any good or service received in exchange)." H. Conf. Rep. 103–213, at 563–64 (1993).

The consideration disclosure requirement in section 170(f)(8) is threefold: the receipt must (1) state whether any goods and services were given as consideration; (2) describe the consideration provided, if any; and (3) give a good-faith estimate of the value of the consideration, if any, unless it consists solely of intangible religious benefits.

Goods and services that must be disclosed include "cash, property, services, benefits, and privileges ... provided in a year other than the year in which the taxpayer makes the payment to the donee organization." 26 C.F.R. § 1.170A–13(f)(5),(6). "A donee organization provides goods or services in consideration for a taxpayer's payment if, at the time the taxpayer makes the payment to the donee organization, the taxpayer receives or expects to receive goods or services in exchange for that payment." 26 C.F.R. § 1.170A–13(f)(6).

*The undisclosed benefit the Addises expected*

■ The main dispute on appeal is whether the Addises received or expected to receive consideration for their payments to the NHF. The Tax Court ruled that the Addises' receipts incorrectly stated they received no consideration because they expected the NHF to make premium payments on a policy that would provide "substantial benefits" to their trust. *Addis v. Comm'r*, 118 T.C. 528, 536, 2002 WL 1284945 (2002). We agree the receipts did not disclose the consideration the Addises expected. We clarify what constituted the undisclosed benefit.

The Addises' $36,000 payments were inducements for the NHF to take the split-dollar deal in the option agreement. The split-dollar insurance arrangement, which conferred benefits on the Addises disproportionate to their 10% premium payments, was the consideration the receipts failed to disclose.

The life insurance policy, with its benefits carved by the split-dollar agreement, was an investment instrument that the designer of the Addises' split-dollar plan, Lawrence D. Cronin, likened to a bond. But the split of investment returns compared to investment outlays was remarkably uneven. For twelve years, the NHF would put up 90% of the investment corpus but be entitled to none of the gains from the projected positive investment performance exceeding the NHF's guaranteed $557,280 in death benefits if Cindi Addis should die. If the Addises surrendered the policy, the NHF would get back just the amounts it paid in, less the cost of its share of the death benefit—and with no compensation for lost interest and other investment value.

The Addises put up only 10% of the investment corpus but were entitled to all

the projected gains in cash value and death benefit amount less the NHF's fixed $557,280 share of the death benefit or the return—without interest—of the NHF's premium outlays exceeding the cost of the NHF's share of the death benefit.

As with any investment, the life insurance policy would take time to build in value. The Addises expected time. Cindi Addis was just 44 and healthy at the start of the split-dollar deal. The Addises contemplated payments by the NHF for twelve years. From the start, Charles Addis wrote Houk: "The premium for National Heritage Foundation's interest under the option is $36,000.00 a year for 12 years."

After twelve years, according to Commercial Union projections, the death benefit would amount to more than $1.53 million. Despite paying 90% of the policy premiums each year, the NHF would only be entitled to its fixed $557,280—about 36% of the projected death benefit. The split-dollar agreement gave the Addises ownership of the remaining projected gain of close to a million—nearly twice the NHF's fixed share of the death benefit even though the NHF paid nine times more of the annual policy premium. After twelve years, the Addises would also own and be able to borrow on a disproportionate share of the projected cash value of the policy.

Why would the NHF take the uneven deal? The Addises' transfers of $36,000 constituted the inducement. The importance of the Addises' payments is highlighted by the fact that the NHF stopped participating in split-dollar deals after Congress imposed a 100% excise tax on a charity that, "in connection" with a transfer of funds, pays, has paid or is expected to pay "any premium" directly or indirectly on life insurance "with respect to the transferor." *See* 26 U.S.C. § 170(f)(10). NHF Director Houk explained that section 170(f)(10) "made our investment possibilities in these [split-dollar] programs unfavorable for us."

The Addises argue the proper inquiry is whether the policy benefits to which they were entitled in 1997 and 1998 were paid for entirely by their $4,000 partial premium payments. The regulatory definition of consideration, however, calls for us to view all the benefits the Addises expected from the split-dollar deal. The regulatory definition of goods and services to embrace expected future consideration means that anticipated consideration must be disclosed even if not currently taxable as income. Each $36,000 payment by the Addises was "in exchange for" the NHF's participation in the split-dollar deal and continuation of the life of the arrangement.

We conclude the Addises expected consideration for their payments to the NHF. The Addises' receipt did not meet any of the three disclosure requirements of section 170(f)(8).

*The Addises' unavailing invocation of exceptions to the consideration disclosure duty*

■ The substantial consideration the Addises expected did not qualify for the exemption from the disclosure requirement for goods and services of "insubstantial value." *See* 26 C.F.R. § 1.170A–13(f)(8). For the exemption to apply, the Addises' payments must have been made "in the context of a fundraising campaign in which the charity informs patrons how much of their payment is a deductible contribution" and "[t]he fair market value of all of the benefits received in connection with the payment" could not have exceeded $69 for the 1997 tax year and $71 for the 1998 tax year. *See* 26 C.F.R. § 1.170A–13(f)(8)(A); Rev. Proc. 90–12, 1990–1 C.B. 471, *supplemented by* Rev.

Proc. 96–59, 1996–2 C.B. 392; Rev. Proc. 97–57, 1997–2 C.B. 584.

The Addises argue that 26 C.F.R. § 1.170A–1(h)(4) permits them to rely on the NHF's receipt and conclude that any goods or services were insubstantial and need not be disclosed. The Addises cannot avail themselves of the protection of section 1.170A–1(h)(4). The regulation provides that "a taxpayer may rely on . . . a contemporaneous written acknowledgment provided under section 170(f)(8) . . . for the fair market value of any goods or services," unless "the taxpayer knows, or has reason to know, that such treatment is unreasonable." 26 C.F.R. § 1.170A–1(h)(4). The Addises were privy to all the details of the split-dollar arrangement. Indeed, Charles Addis wrote to the NHF to propose the benefits split. The Addises had reason to know that the consideration they expected was substantial.

*The consequences: complete denial of a deduction for the transfers*

Section 170(f)(8) provides that when its substantiation provisions are not satisfied "[n]o deduction shall be allowed" for payments of $250 or more. The plain language of the provision forbids a deduction to the Addises. Having failed to satisfy a provision intended to ensure compliance with the rule of partial charitable contribution deductions for quid pro quo payments, the Addises nonetheless seek to avail themselves of the quid pro quo rule and argue in the alternative for a partial deduction. A partial deduction is foreclosed by the statutory language. The deterrence value of section 170(f)(8)'s total denial of a deduction comports with the effective administration of a self-assessment and self-reporting system.

As the Tax Court's denial of deductions based on 26 U.S.C. § 170(f)(8) was proper, we have no occasion to reach the Commissioner's alternative contention that 26 U.S.C. § 170(f)(3) also bars the deductions because, in substance, the Addises gave the NHF a gift of a partial interest in property.

AFFIRMED.