T.C. Memo. 2018-168

UNITED STATES TAX COURT

WAYNE R. FELTON AND DEONDRA J. FELTON, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 9644-14.                    Filed October 10, 2018.

<u>Thomas Edward Brever</u>, for petitioners.

<u>John Schmittdiel</u> and <u>Blaine C. Holiday</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HOLMES, <u>Judge</u>:  Holy Christian Church in St. Paul, Minnesota boasts a

diverse and devoted congregation of about 600 families, in no small part

attributable to its founder and pastor--the Reverend Wayne R. Felton.  A religious

life often requires financial sacrifice, and Reverend Felton had his fair share of

**[*2]** that in the early years of his church. But in both 2008 and 2009 his congregants gave him over $200,000 in cash and personal checks in addition to their regular church offerings.

Reverend Felton says they were nontaxable gifts. The Commissioner wants them taxed and wants a penalty too.

FINDINGS OF FACT

Reverend Felton found his vocation at Tuskegee University, where he assisted the dean of the school's chapel while still a student. He also first learned about "shake-hand" money at that chapel--the custom in some evangelical churches of handing donations to the pastor on the way out of church. Reverend Felton didn't like the way the chapel handled these donations and silently resolved to do things differently if he ever had a church of his own to run.

That would take a while. After earning his bachelor's degree Reverend Felton enrolled at Asbury Theological Seminary. He finished with a master's degree, and joined an established Christian denomination as a pastor and "national evangelist" setting up new churches. But it wasn't long before Reverend Felton and his wife, Deondra Felton, moved to "Minnesota independent of that organization to begin all new."

[*3]   In 2000 Reverend and Mrs. Felton established Holy Christian Church in West St. Paul, where it became known as a multiracial nondenominational church "in which all are welcome."  The soil was good and the increase was more even than a hundredfold--there are about 600 families in the congregation, and Sunday services average around 500 people.  Reverend and Mrs. Felton are very involved in the church's day-to-day operations.  Reverend Felton is a charismatic man and, it would seem to secular eyes, a significant draw to his church.  (Though we have no doubt that Reverend Felton would say that, from his perspective, it is grace and the call to worship together that draws his congregation in.)  Mrs. Felton also plays an important role.  She was too modest to elaborate on this at trial, but Reverend Felton testified that she's the pastor of women's affairs and that she has long helped with the business of running the church.  We find that both Reverend Felton and Mrs. Felton work hard at their vocations.

Holy Christian Church is not the only one planted by Reverend Felton.  He is also the presiding bishop (or archbishop) of Holy Christian Church International.  Reverend Felton didn't describe it exactly this way, but Holy Christian Church International is a mother church--it established the Holy Christian Church in St. Paul and also set up churches in Rwanda, Liberia, Jamaica, Florida, Louisiana, and another one in Minnesota.  These seeds also fell on fertile

**[*4]** ground: Rwanda has 105 congregations of various sizes; Liberia has 120 congregations of 30 to 300 people; Jamaica's has about 100 people; Florida's has about 100 people and Louisiana's about 50; and the other church in Minnesota has approximately 70 in its congregation. Reverend Felton credibly testified that in this his evangelism is "like any other in church history."

We find it likely that Reverend Felton's personality and moving oratory make a difference. Reverend Felton also counsels those in need, whether professional athletes who want to find the narrow path through their fame, or married couples in trouble with their own vocations to family life. He's also hired to speak not only to other meetings of the faithful, but also to more worldly institutions like the University of Minnesota Carlson School of Management and Gustavus Adolphus College.

Tending to the material needs of such a network of churches requires some skill, of course, and we find that the Feltons run Holy Christian Church in a businesslike manner suitable to its status as a tax-exempt organization. Reverend and Mrs. Felton sit on the church's executive board, along with deacons and lay members whom Reverend Felton selects. This board, however, is only advisory: Reverend Felton can remove its members at any time for any reason, and the board didn't hire him, can't fire him, and doesn't get to tell him what to do. But

**[\*5]** Reverend Felton still respects and follows board decisions. (He and Mrs. Felton, for example, don't participate in board decisions about their salaries.) He also follows church bylaws and has "never overrode as it pertains to business matters any decision of the executive board." Church business operations are carefully organized and executed.

This sober approach is particularly evident in how the church collects and records offerings from its members. Reverend Felton testified that "the offering is raised, we believe in the biblical pattern of bringing your offering, people literally, from the balcony to the overflow room downstairs, bring their offering to the front and that offering is received." The collection is kept secure until the end of the service, when it is counted and verified. After that, it's deposited, and the church's business administrator enters member information and donation amounts into Shepherd's Staff--accounting software designed for that purpose. The church uses Shepherd's Staff to produce annual contribution statements for its members.[1]

How does the business administrator know what to enter into Shepherd's Staff? For some members she finds the relevant information on their checks, but

---

[1] The program produces spreadsheets with breakdowns for contributions to the "general fund," "pastor's gift," the "pledge fund," and "tithes". The statements report total annual contributions and also show the dates and amounts of each contribution made throughout the year.

[*6] for many others the church relies on contribution envelopes. There were three different envelopes in the years at issue: white, gold, and blue.

Congregants used white envelopes for the normal contributions that sustain the church; these envelopes also include a line marked "pastoral", which Mrs. Felton characterized as the line for those who wanted to "sow a seed" directly to Reverend Felton. Members could grab white envelopes on their way into church, and ushers also notified congregants during services by holding them up and handing them around. The church tracked donations in these white envelopes --including donations marked "pastoral"--in Shepherd's Staff; it included them in the members' annual contribution statements, and Reverend Felton got a breakdown of pastoral donations that showed how much income he had to report. The contributions that members made in gold envelopes were used for special programs and retreats. As with the donations made in white envelopes, the church tracked those made in gold envelopes in Shepherd's Staff and included them in the members' annual contribution statements.

White envelopes looked like this:

[*7]

30 ck

# THE HOLY CHRISTIAN CATHEDRAL
125 Stevens Street W.  St. Paul, MN 55107 (651) 290-WORD (9673)  www.thcci.org
*"Where Something Good Is Always Happening!"*

☐ Member  ☐ Visitor
(Please complete this required information)

Date: _____

Name: _____

Address: _____
_____

Telephone: _____

Email: _____

Envelope Number: _____

| | | |
|---|---|---|
| TITHE | $ | 20 |
| OFFERING | $ | 10 |
| PLEDGE | $ | |
| PASTORAL | $ | |
| OTHER | $ | |

Card Number: _____
Expiration Date: _____
Security Code: _____

TOTAL: $ 30

The ministry may redirect funds as deemed necessary.  Thank you for your contribution to God's Kingdom.

Docket No. 9644-14
Exhibit 7-J

**[*8]** Blue envelopes came later than white and gold. Reverend Felton was, as we wrote, uncomfortable with "shake-hand" money; he recognized, however, that his congregation wanted to give, and he "didn't want to necessarily hurt anyone's feelings." White envelopes already allowed for pastoral donations, but they caused an unusual problem: Reverend Felton felt that some congregants wanted to make sure they did *not* get a tax deduction for the amounts they gave him--"there were some who said * * * 'I did not want this to be counted for tax, I wanted it to be a gift.'" So Reverend Felton and the rest of the executive board came up with a solution--the blue envelope. (We have no idea how many church members itemize or the ratio of those who pick white envelopes compared to those who choose blue.)

Blue envelopes looked like this:

[*9]

**PASTORAL GIFT**
BISHOP WAYNE R. FELTON
THE HOLY CHRISTIAN CATHEDRAL
125 STEVENS STREET W. SAINT PAUL, MN 55107
(651) 290-WORD (9673)   WWW.THCCI.ORG

☑ Member   ☐ Non-Member
(Please complete this required information)

Date _____

Name: _____

Address: _____

_____

Telephone: _____

Email: _____

Envelope Number: _____

Gift Amount: $_____

Card Number: _____

Expiration Date: _____

Security Code: _____

Checks: Please make payable to Bishop W.R. Felton
Thank you for your contribution to God's Kingdom

**PASTORAL GIFT**
THE HOLY CHRISTIAN CHURCH
CATHEDRAL OF GLORY
125 STEVENS ST. W., ST. PAUL, MN 55107   Ph. (651) 290-WORD (9673)
WWW.THEHOLYCHRISTIANCHURCH.ORG
GIFT AMOUNT: $
Please make checks payable to: Bishop W. R. Felton

Name: _____
Address: _____

Please complete address if you are a first time contributor. Thank You.

Date: _____   Envelope Number: _____

Card Number: _____   Expiration Date: _____

Thank you for your contribution into God's Kingdom.

Docket No. 9644-14
Exhibit 6-J

[*10] Reverend Felton first told his congregation about the blue envelopes at the church's annual business meeting. He explained that if members were so inclined they could donate to him in blue envelopes but they wouldn't get a tax deduction if they did.[2] Blue envelopes weren't as ubiquitous as white envelopes--ushers didn't hand them out at the church's entrance and, although ushers had them, they followed the custom that a member had to ask for one if he wished to give in that way. And, while Reverend Felton regularly preached about tithes and offerings--made in the white envelopes--he didn't preach about making personal donations to him in the blue. Those weren't the only differences between white and blue envelopes. The church opened white envelopes and tracked the donations made in them, but all the blue envelopes were handed over to Reverend Felton unopened.

We summarize the differences between white and blue envelopes:

---

[2] Two of Reverend Felton's congregants testified about pastoral donations. They each said that they made donations to Reverend Felton to "bless" him or "sow unto" his life, and expected no future pastoral services in return. We find their testimony credible, but we note that both congregants said that they didn't in fact use blue envelopes to make their donations--one made hers online and the other made his by check with no envelope. Nobody who had actually made a donation in a blue envelope testified, and the parties didn't stipulate that all the congregants' subjective intentions were the same as those of the two who did testify.

| [*11]<br><br>Envelope color | Were donations solicited? | Did ushers distribute these envelopes unsolicited? | Were church members told these donations were deductible? |
|---|---|---|---|
| White | Yes | Yes | Yes |
| Blue | No | No | No |

We can also summarize the estimated amounts that the church collected in each:[3]

| Envelope color | 2008 | 2009 |
|---|---|---|
| White | $1,000,000 | $1,000,000 |
| Blue | 258,001 | 234,826 |

New churches bring forth "first the blade, then the ear, after that the full grain in the ear." Mark 4:28. And for the years at issue here, Holy Christian Church and its affiliates were definitely at the full-grain-in-the-ear stage. But it was not always so. Eric Jenson, an elder at Holy Christian Church, related about Reverend Felton's sacrifices: "[Y]ou hear stories of the early days when, you know, he was going without * * * any paycheck, and going without a home for periods of time, but carrying out the work of the ministry because he was called to

---

[3] The parties stipulated the collected money that Reverend Felton received for 2008 and 2009, and Reverend Felton provided estimates at trial for the white envelopes. He also estimated the gold-envelope donations in each year, which he said were only about $10,000 in 2008 and $5,000 in 2009.

[*12] do it." Reverend Felton preached at the church for almost thirteen years without a salary and, although the executive board authorized a salary for him in 2008 and 2009, he didn't take it. We find this testimony credible, but it prompts a question: How did Reverend Felton and his wife support their family?

The first, and most obvious, answer is the blue-envelope donations, which exceeded $200,000 in both of the years at issue. Reverend Felton testified that he also received in-kind donations from "private donors * * * who did not want to identify themselves." The church itself didn't pay Reverend Felton a salary, but it did track the "pastoral donations" that congregants made in white envelopes and issued a report to him about those at the end of the year. The report for 2008, for example, shows that Reverend Felton received just over $40,000 in pastoral donations in white envelopes. And the church also gave Reverend Felton a parsonage allowance[4] of $6,500 per month, an amount which we find he

---

[4] Section 107(2) excludes from the gross income of a "minister of the gospel" a "rental allowance paid to him as part of his compensation" (i.e., a parsonage allowance). Some have questioned whether the section conflicts with the Constitution's Establishment Clause, see, e.g., Warren v. Commissioner, 282 F.3d 1119 (9th Cir. 2002) (order requesting supplemental briefs), but it wasn't until recently that a court actually held the section unconstitutional, see Gaylor v. Mnuchin, 278 F. Supp. 3d 1081, 1089-92 (W.D. Wis. 2017). That decision is on appeal to the Seventh Circuit; it's also not an issue in this case. (All section references are to the Internal Revenue Code in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless we

(continued...)

[*13] accurately described as "a very, very nice and handsome housing allowance." Finally, there are the private counseling and speaking engagements that Reverend Felton booked through a separate company--Bishop Wayne R. Felton Ministries, LLC. This company had over $60,000 in gross receipts in both years, and net profit of $30,000 in 2008 and $40,000 in 2009 that the Feltons reported on a Schedule C.

Reverend Felton, however, continued to prepare his own returns even as the churches grew and the organization of his secular affairs became more complex. He was also slow in filing, and he and his wife filed both the returns at issue here well over a year after they were due. The Feltons didn't report as income on those returns any of the donations they got in blue envelopes, but they did report about $40,000 in wages for each year. These reported wages were the amounts made in white envelopes that donors had designated as "pastoral" donations. The Feltons excluded the almost $80,000 parsonage allowance from their gross income under section 107(2) and deducted more than $50,000 in mortgage-interest expense for each of those years.[5] They also claimed about $50,000 in charitable deductions for

---

[4](...continued)
say otherwise.)

[5] Expenses that are allocable to tax-exempt income are often nondeductible,
(continued...)

**[\*14]** both 2008 and 2009--significant figures compared to the approximately $70,000 to $80,000 of gross income that they reported for each of those years. The bottom line produced by these exclusions, exemptions, and deductions was that the Feltons reported no taxable income on either return.

After the Commissioner audited them, he issued a notice of deficiency in which he made several adjustments and determined penalties. The Feltons disagreed and petitioned our Court. They were at the time, and remain, Minnesota residents. The parties settled many issues before trial, and the main one left for us to decide is whether the donations that Reverend Felton received in blue envelopes are income or gifts. We'll also need to determine whether the Feltons are liable for additions to tax under section 6651(a)(1) and accuracy-related penalties under section 6662(a).

## OPINION

The dispute between the Commissioner and the Feltons has roots deep in Christian history, and both parties can see their positions staked out as far back as St. Paul. "Who planteth a vineyard, and eateth not of the fruit thereof? Or who

---

[5](...continued)
see sec. 265(a)(1), but that general rule doesn't apply to mortgage interest or real-property taxes on the home of a taxpayer who pays those expenses with an excludable parsonage allowance, sec. 265(a)(6)(B); see also Rev. Rul. 87-32, 1987-1 C.B. 131.

[*15] feedeth a flock, and eateth not of the milk of the flock?" 1 Cor. 9:7. And "[e]ven so hath the Lord ordained that they which preach the gospel should live of the gospel." 1 Cor. 9:14. In our era, the Commissioner might have argued, all this milk and fruit constitute income upon receipt. See sec. 61 (gross income defined as income from whatever source deriveth).

But the relationship between a pastor and his flock is far from entirely commercial, and the Feltons argue that, at least in part, they are supported by gifts, not wages justly bargained for and justly earned in the marketplace: "[W]hen I preach the gospel, I may make the gospel of Christ without charge, that I abuse not my power in the gospel." 1 Cor. 9:18. And "[y]e sent once and again unto my necessity. Not because I desire a gift: but I desire fruit that may abound to your account. But I have all, and abound: I am full." Phil. 4:16-18.

We have already found that the transfers--whether gifts or compensation-- have left the Feltons very full indeed. But our tax system is somewhat more complicated than the ancients', and meeting its exactions can only rarely be extinguished with the draught of a single fish. See Matt. 17:27. To decide this case, we must therefore descend from the sacred to the profane.

**[\*16]** I.     Basic Principles

Section 61(a)(1) says that gross income includes "[c]ompensation for services, including fees, commissions, fringe benefits, and similar items." See also Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 431 (1955) (broadly construing gross income as "undeniable accessions to wealth, clearly realized, and over which the taxpayers have complete dominion"). That's a big net, but Congress cut a small hole in it with section 102. Section 102(a) excludes from gross income "the value of property acquired by gift." We note, however, that section 102(a) has its own limitation--the exclusion doesn't apply to "any amount transferred by or for an employer to, or for the benefit of, an employee." Sec. 102(c)(1).[6] The Feltons argue that the donations in the blue envelopes are gifts from individual church members, and are therefore excludable from income under section 102(a). The Commissioner says they're not gifts, and are thus income under section 61(a).

---

[6] The Commissioner hasn't argued that we should apply section 102(c)(1) in this case, and it's unclear whether it could apply. See Goodwin v. United States, 67 F.3d 149, 153 n.5 (8th Cir. 1995). We can't say that the individual church members are Reverend Felton's employers, and the Commissioner hasn't argued that any of the blue-envelope donations were made "for" the church--his employer--within the meaning of section 102(c)(1). See id.

**[\*17]** What's a gift?  The Supreme Court has defined it:  "A gift in the statutory sense * * * proceeds from a 'detached and disinterested generosity,' * * * 'out of affection, respect, admiration, charity or like impulses.'"  Commissioner v. Duberstein, 363 U.S. 278, 285 (1960) (first quoting Commissioner v. LoBue, 351 U.S. 243, 246 (1956); and then quoting Robertson v. United States, 343 U.S. 711, 714 (1952)).  The Court also recognized that this definition might not be easy for a trial court to apply, because it "does not lend itself to a[] * * * definitive statement that would produce a talisman for the solution of concrete cases."  Id. at 284-85.  The Court held that the most critical consideration is the transferor's intention when the payment was made.  Id. at 285-86 (citing Bogardus v. Commissioner, 302 U.S. 34, 43 (1937); id. at 45 (Brandeis, Stone, Cardozo, Black, JJ., dissenting)).  But the transferor's characterization of his intention "is not determinative," the Court warned; "there must be an objective inquiry as to whether what is called a gift amounts to it in reality."  Id. at 286 (citing Bogardus, 302 U.S. at 40).  With all that said, there is no bright-line test, and decisions "in these cases must be based ultimately on the application of the fact-finding tribunal's experience with the mainsprings of human conduct to the totality of the facts of each case."  Id. at 289.

**[*18]** II.     Donations to Clergy

We do not think that this call for reliance on experience with the mainsprings of human conduct means reliance on any single judge's experience, but is rather a call for trial courts to make an objective inquiry by comparing the facts of the cases before them to other cases decided over many decades. This is especially true when we have to gauge the intent of a great many transferors whose identities are unknown to us, and who couldn't all be reasonably asked to testify. Our goal is to make a reasonable finding about the intent of the many members of Reverend Felton's congregation who gave him money in blue envelopes. It's a factual determination, but one where the higher courts know that "[d]oubtless diversity of result will tend to be lessened somewhat since federal income tax decisions, even those in tribunals of first instance turning on issues of fact, tend to be reported, and since there may be a natural tendency of professional triers of fact to follow one another's determinations, even as to factual matters." Id. at 290. We will therefore look at the Feltons' situation back in 2008 and 2009 and compare it to similar situations in which courts have had to distinguish gifts from income.

We begin by acknowledging the long tradition among the faithful of most religions to give to their spiritual leaders. This means that we have many cases

[*19] about the taxability of transfers from the faithful to clergy.  Some are so egregious that they cross over into criminal-tax territory--cases like United States v. Terrell, 754 F.2d 1139 (5th Cir. 1985), where a jury convicted an evangelist of criminal tax evasion.  Terrell preached at churches and tent revivals where he collected donations for his church and for himself that he called "love offerings." Id. at 1143.  Terrell made appeals for the offerings--one congregant testified that Terrell said he was a prophet and that those who gave to him would receive a prophet's reward.  Id. at 1150.  Church members put money in a bucket and Terrell's apron pockets during services, or mailed their offerings in contribution envelopes to his post office box in Texas.  Id. at 1143.  The criminal investigation showed that Terrell's church didn't pay him a salary, and the government had to reconstruct his income.  Id. at 1142.  This showed that "[t]he likely source of * * * [Terrell's] income was money earned through his ministry."  Id. at 1143.  He had exclusive control over his church's recordkeeping, and he understated the amount of the weekly "love offerings" he received by about 80% in the records that he gave his accountant.  Id.

On these facts, the Fifth Circuit held that the following jury instruction was an accurate statement of the law:

**[\*20]** The federal income tax is levied on income received by ministers. When an individual provides ministerial services as his trade or business, controls the money he receives in that business, and receives no separate salary, the income of that business is taxable to the minister. Voluntary contributions, when received by the minister, are income to him. Payments made to a minister as compensation for his services also constitute income to him. If money is given to a minister for religious purposes, any money used instead for the personal benefit of the minister becomes taxable income to him.

Id. at 1148-49.

There are also cases where the donations were labeled "honoraria" or "salary", but ultimately found to be gifts--cases like Mutch v. Commissioner, 209 F.2d 390 (3d Cir. 1954), and Schall v. Commissioner, 174 F.2d 893 (5th Cir. 1949), rev'g 11 T.C. 111 (1948).[7] Mutch, 209 F.2d at 391, was about a beloved minister who served his church for 24 years before he had to retire when his health went bad. Before then, the church had paid his salary and contributed to his pension. Id. But after he fell ill, the church elders feared that he wouldn't have enough income in retirement to live "'as * * * [they] would like * * * [their] old minister to live.'" Id. The church's trustees passed a resolution to give him a modest monthly honorarium contingent only upon the church's future prosperity.

---

[7] These cases predate Duberstein, but they came after, and relied in part on, Bogardus, 302 U.S. 34 (1937)--an opinion the Supreme Court looked to at length when it formulated the factbound Duberstein test. We've also cited these cases since Duberstein when parsing the gift-or-income question. See Brimm v. Commissioner, T.C. Memo. 1968-231, 27 T.C.M. (CCH) 1148, 1151 (1968).

[*21] Id. at 391-92. The Third Circuit focused on the objective evidence of the congregation's intent to find that the honorarium was a gift. Id. at 392. It said that the action "was motivated solely and sincerely by the congregation's love and affection for Dr. Mutch"--that "Dr. Mutch had been adequately compensated as far as money could for his services in the past," and "[h]e was not being tied into any promise of services in the future." Id.

Schall is similar. Dr. Schall was pastor at a church in Pennsylvania for almost two decades when health problems also forced him to retire. Schall, 174 F.2d at 893. His doctor told him he needed to move to Florida to escape the harsh Pennsylvania winters. Id. The church paid Dr. Schall a salary of $6,000 per year when he was pastor, but his congregation knew that he would be financially unable to move to Florida. Id. It unanimously adopted the following resolution:

> Whereas the pastor of this Church, Rev. Dr. Charles Schall, has become incapacitated for the further service as pastor * * * ; and
>
> Whereas the Congregation moved by affectionate regard for him and gratitude for his long and valued ministry among them, desire that he should continue to be associated with them in an honorary relation;
>
> Now, Therefore, Be It Resolved that, effective upon formal dissolution by Presbytery, Rev. Charles Schall be constituted Pastor Emeritus of this church with salary or honorarium amounting to Two Thousand Dollars ($2,000) annually, payable in monthly installments, with no pastoral authority or duty * * *

**[*22]** Id. at 893-94. Much as did the Mutch court, the Fifth Circuit focused on the congregation's objective intent as seen in the fact that Dr. Schall never agreed to provide future services for the payments and never did. See id. at 894. "That only is a gift which is purely such," according to the Fifth Circuit, "not intended as a return of value or made because of any intent to repay another what is his due, but bestowed only because of personal affection or regard or pity, or from general motives of philanthropy or charity." Id. (quoting Bass v. Hawley, 62 F.2d 721, 723 (5th Cir. 1933)). It held that Dr. Schall's honorarium was a gift. Id.

Then, of course, there are the cases where it's harder to draw a line between gifts and income. In Banks v. Commissioner, T.C. Memo. 1991-641, 62 T.C.M. (CCH) 1611, 1612 (1991), a minister formed a church that the IRS recognized as tax exempt under section 501(c)(3). Banks drew a salary from the church in each of the years at issue, but church members also gave her cash on four "special" days in each year: her birthday, Mother's Day, the church's anniversary, and Christmas. Id. at 1612. Banks preached that church members were required to tithe, and the members got together to decide how much to transfer to her on each of the "special" days. Id. Members also made contributions directly to the church. Id. at 1613. Here's a summary:

| [*23] Transfer type | 1982 | 1983 | 1984 |
|---|---|---|---|
| Banks' salary | $10,985 | $17,223 | $41,945 |
| "Special" donations | 41,919 | 43,175 | 46,900 |
| Church donations | 25,694 | 109,807 | 113,785 |

Id. at 1612-13. Members of Banks' congregation testified that they made the "special" donations to show their "'appreciation' of * * * [Banks] and her ministry, because she had done a lot of things for them and was there to help them with their problems, and to say thank you." Id. at 1614. One congregant said that the "special" donations were made because Banks "was a good pastor and the congregation wanted to keep her." Id.

We found that the "special" donations were compensation for Banks' services and thus income. Id. We found that church members didn't make the transfers primarily out of detached and disinterested generosity, but instead out of their desire to reward Banks for her services and their hope that she would continue as their pastor. Id. This was evident from the congregants' testimony, but there was also "strong, objective evidence that the amounts transferred to * * * [Banks] were part of a highly structured program for transferring money to [her] on a regular basis." Id. Church members had a program to transfer money to Banks on four "special" days, and there was a regularity to the amounts transferred

**[\*24]** by individual members on each of the four days.  Id.  "The existence of such a program," we reasoned, "suggests that the transfers did not emanate from a detached and disinterested generosity but, instead, were designed to compensate \* \* \* [Banks] for her service as a minister."  Id.

But the Feltons are Minnesotans, and Minnesota is in the Eighth Circuit, which brings us to perhaps the most important precedent for them, Goodwin v. United States, 67 F.3d 149 (8th Cir. 1995).  Reverend Goodwin was pastor at his church for more than twenty years, and his church also flourished under his stewardship.  See id. at 150.  From 1987 through 1989 the church paid his salary and gave him a parsonage allowance.  Id.  Early in his ministry, the congregation also began making gifts to him; by 1987 it "had developed a regular procedure for making special occasion gifts" on the same three days each year.  Id.  About two weeks before each "special occasion," the associate pastor announced that those who wished to do so could make gifts by putting cash (to preserve anonymity) in envelopes.  Id.  The associate pastor then gave the cash to Reverend Goodwin, and the church kept no record of amounts given or who contributed.  Id.  These were the numbers:

| [*25] Type of receipt | 1987 | 1988 | 1989 |
|---|---|---|---|
| Salary | $7,800 | $14,566 | $16,835 |
| Parsonage allowance | 6,000 | 6,000 | 6,000 |
| "Special occasion" gifts | 12,750 | 14,500 | 15,000 |

Id. Reverend Goodwin argued that the "special occasion" gifts were nontaxable gifts "as a matter of law," because the parties stipulated that church members made them "out of love, admiration, and respect, not out of a sense of obligation or fear that Goodwin might otherwise leave." Id. at 152.

The Eighth Circuit disagreed. It made an objective inquiry and reasoned that the "critical fact * * * is that the special occasion gifts were made by the congregation as a whole." Id. The "cash payments were gathered by congregation leaders in a routinized, highly structured program," individual church members contributed anonymously, and the payments were made to Reverend Goodwin on behalf of the whole congregation. Id. The court highlighted these points:

- the congregation funds the church, and that includes Reverend Goodwin's salary;

- the "special occasion" gifts were substantial compared to his salary;

- the congregation knew that, without the gifts, it wouldn't be able to keep its "popular and successful minister at the relatively low salary it was paying;" and

**[*26]** ● "[r]egular, sizable payments made by persons to whom the taxpayer provides services are customarily regarded as a form of compensation and may therefore be treated as taxable income."

Id. at 152-53 (citing a Ninth Circuit case, Olk v. United States, 536 F.2d 876, 879 (9th Cir. 1976), about tips to casino dealers for the last proposition). The Eighth Circuit held that the "special occasion" gifts were income. Id. at 153.

As all courts have done since Duberstein, we'll focus here on objective evidence of the transferors' intent to determine whether the blue-envelope donations were gifts or income. The caselaw on donations to clergy shows that the following things are important in distinguishing between taxable payments and gifts:

● whether the donations are objectively provided in exchange for services;

● whether the cleric (or other church authorities) requested the personal donations;

● whether the donations were part of a routinized, highly structured program, and given by individual church members or the congregation as a whole; and

● whether the cleric receives a separate salary from the church and the amount of that salary in comparison to the personal donations.

*Donations in Exchange for Services*. Two of Reverend Felton's congregants testified that they expected no future pastoral services in exchange for

**[\*27]** the donations they made to him. We've noted, however, that neither of those congregants made donations in blue envelopes, see supra note 2; even if they had, we wouldn't find their testimony decisive on this factor. The cases tell us to look at *objective* rather than *subjective* expressions of intent,[8] and we cannot find objective signs that the blue-envelope donations were unrelated to future services. This case isn't anything like those with retiring ministers, for example, where the congregations quite clearly understood that the additional retirement payments had nothing to do with services. See Mutch, 209 F.2d at 392; Schall, 174 F.2d at 893-94. Reverend Felton founded Holy Christian Church, and he's a devoted pastor. Although he didn't explicitly agree to provide future services *only* in exchange for blue-envelope donations, we don't think that that proof of his subjective intent is required either.

Since 1993 Congress has required a "contemporaneous written acknowledgment" for all but the smallest gifts to a church or other charity.

---

[8] The Feltons also failed to show that the congregants who actually made blue-envelope donations would have said the same thing about their intent as the two who did testify. In Banks v. Commissioner, T.C. Memo. 1991-641, 62 T.C.M. (CCH) 1611, 1614 n.5 (1991), on the other hand, the Commissioner agreed that all church members would say the same thing as the ones who actually testified, and in Goodwin, 67 F.3d at 150, the parties stipulated that "[a]ll members of the Church deposed or interviewed maintain that * * * gifts * * * are not given out of any sense of obligation or any sense of fear that [Reverend Goodwin] will leave their parish if he is not compensated beyond his yearly salary."

**[*28]** <u>See</u> Omnibus Budget Reconciliation Act of 1993, Pub. L. No. 103-66, sec. 13172, 107 Stat. at 455 (adding section 170(f)(8) to the Code).  Part of the more-or-less standard form language the Commissioner suggests is that "no goods or services were provided by the organization in return for the contribution."  IRS Pub. 1771 (2016) (referencing the substantiation requirements of section 170(f)(8)(B)(ii) and section 1.170A-13(f)(2)(ii), Income Tax Regs.).  And the Commissioner's informal guidance goes on to state carefully that the recipient "must also provide a good faith estimate of the value of the goods or services because a donor must generally reduce the amount of the contribution deduction by the fair market value of the goods and services provided by the organization."  <u>Id.</u>; <u>see also</u> <u>15 West 17th Street LLC v. Commissioner</u>, 147 T.C. 557, 562 (2016) ("Generally, the amount of the [charitable contribution] deduction is the value of the property contributed reduced by the value of any consideration that the taxpayer receives in exchange for the gift." (citing <u>Addis v. Commissioner</u>, 118 T.C. 528, 536 (2002), <u>aff'd</u>, 374 F.3d 881 (9th Cir. 2004))).  This is understandable from a secular point of view, but one might think a faithful person would be stunned at the implicit assumption about the value of a good minister to his life--isn't the provision of sacraments or the transmission of the Almighty's word a service of great value, indeed of eternal and immeasurable value?

**[\*29]** In tax law, though, such returns on a faithful person's donative investment are called "intangible religious benefits." <u>See</u> sec. 170(f)(8)(B)(iii).  They don't count as items of value received by a donor in exchange for his donations.  <u>See</u> <u>id.</u> And we think the same logic applies from the perspective of the recipient:  The vocation of a minister is very often a calling quite unmotivated by hope or expectation of material gain.  But even though the tax system labels some of the benefits given by a minister to his faithful as intangible and religious, <u>Duberstein</u> reminds us that a payment can be for services rendered even if the payor receives no *economic* benefit from it.  <u>Duberstein</u>, 363 U.S. at 285.  From personal observation at trial we think it highly likely that Reverend Felton would follow his vocation whether he and his church got envelopes of any color.  But we also think that the exhortation by the Supreme Court in <u>Duberstein</u> to focus on objective evidence of a donor's intent means we have to ask whether the donations are of the magnitude and type that would make us doubt that what is called a gift amounts to one in reality.  <u>See</u> <u>id.</u> at 286.

We do therefore find that by this measure the contributions made in blue envelopes were not gifts as that term has developed in tax law, but are rather-- from an objective perspective--meant to keep Reverend Felton preaching where he is.  He provides those "intangible religious benefits," and the blue envelopes are in

**[*30]** exchange for them and would to any reasonable person look like an incentive for him to keep providing them. This factor tilts towards income.

*Donation Requests*. Reverend Felton introduced the blue envelopes at the church's annual business meeting, where he explained that members could use them to make personal donations to him but that there would be no tax deduction if they did. It seems that that was the last time anyone from the church talked about the blue envelopes with the congregation. Congregants had to specifically ask an usher for a blue envelope and ushers didn't hawk them. Reverend Felton also preached about tithes and offerings in white envelopes, but he never preached about personal donations in blue envelopes.

This is different from Goodwin and Banks. In both of those cases, personal donations were openly and regularly discussed in the church. In Goodwin, 67 F.3d at 150, two weeks before "special occasion" days "the associate pastor announced--before Church services, when the Goodwins were not present--that those who wish to contribute to the special occasion gift may do so." In Banks, 62 T.C.M. (CCH) at 1614, a congregant testified that "members made pledges of cash * * * on the four 'special' days of the year and that the amount 'pledged' by the individual church members was determined at open meetings at the Church." The fact that the church didn't solicit blue-envelope donations is an objective sign that

**[\*31]** the transferors proceeded "from a 'detached and disinterested generosity,' * * * 'out of affection, respect, admiration, charity or like impulses.'" See Duberstein, 363 U.S. at 285 (quoting LoBue, 351 U.S. at 246, and Robertson, 343 U.S. at 714). This factor tilts towards gift.

*Routinized, Highly Structured Program.* The third factor we've gleaned from the caselaw is whether the donations were part of a routinized, highly structured program, and given by individual members or the congregation as a whole. This case differs in some respects from Goodwin and Banks on this factor, but we think it has great similarities in the most important respects. The blue-envelope donations were made by individual church members, which is different from the anonymous cash donations that the Goodwin court found the congregation made as a whole. See Goodwin, 67 F.3d at 152. And in contrast to both Goodwin and Banks, we are dealing here with donations that congregants made throughout the year as opposed to only a few "special" days in each year. See Goodwin, 67 F.3d at 150; Banks, 62 T.C.M. (CCH) at 1612.

But there are also things about the donations here that show a routinized, highly structured program. The blue-envelope system in and of itself is evidence of a structured program: The envelopes say "pastoral gift" on them, and they list all the necessary information about Holy Christian Church and how to make

[*32] checks out to Reverend Felton personally. Donations made in these envelopes are objectively different from the occasional "twenty dollar gift spontaneously given by a church member after an inspiring sermon." Goodwin, 67 F.3d at 152. We also can't ignore the sheer size of blue-envelope donations in 2008 and 2009, or the fact that they are very similar in amount in both years-- within 10% of each other. We find it more likely than not that this means there was a "regularity of the payments from member to member and year to year," which "indicates that they were the result of a highly organized program to transfer cash from church members" to Reverend Felton. Banks, 62 T.C.M. (CCH) at 1614. These are regular, sizable payments made by people that Reverend Felton provides a service for, and they are therefore hard to distinguish from compensation. See Goodwin, 67 F.3d at 152-53. This factor tilts towards income.

*Ratio of Church Salary to Personal Donations*. And that brings us to the final factor. Though the executive board approved a salary for Reverend Felton in 2008 and 2009, the church didn't actually pay it out to him in either of those years. Reverend Felton testified that he had in fact preached at the church for almost thirteen years without a salary. He did receive personal donations from some members of the congregation in white envelopes, and he did report them as wages

[*33] in 2008 and 2009. See supra pp. 13-14. The church also gave him a parsonage allowance of almost $80,000 per year. But look at how this stacks up against the blue-envelope donations:

| Type of receipt | 2008 | 2009 |
| --- | --- | --- |
| White-envelope donations | $40,000 | $40,000 |
| Parsonage allowance | 78,000 | 78,000 |
| Blue-envelope donations | 258,001 | 234,826 |

This all makes the blue-envelope donations seem more like income than gifts. The only other case we've cited where the church paid *no* salary was Terrell, which was a criminal tax-evasion case. And even if we treat the white-envelope donations as Reverend Felton's salary--as he seems to have done on his returns--the ratio of that income and the parsonage allowance to blue-envelope donations gives the distinct impression that the transferors knew that, without the donations, they wouldn't be able to keep their "popular and successful minister." See Goodwin, 67 F.3d at 152. Reverend Goodwin's "special occasion" gifts were *less* than the total of his salary and parsonage allowance. Id. at 150. Reverend Felton's purported gifts are around double the total of his deemed salary and parsonage allowance for both of the years at issue.

**[\*34]** As another former seminarian is widely thought (though unlikely actually) to have said: "Quantity has a quality all its own." When comparatively so much money flows to a person from people for whom he provides services (even intangible ones), and to whom he expects to provide services in the future, we find it to be income and not gifts.

## III. Penalties

Only additions to tax and penalties are left. The Commissioner determined one of each for both years--failure-to-timely-file additions to tax under section 6651(a)(1) and accuracy-related penalties under section 6662(a)--but only the accuracy-related penalties need analysis.[9]

Section 6662(a) imposes a 20% penalty when there is "[a]ny substantial understatement of income tax," sec. 6662(b)(2), which exists if the tax understatement exceeds the greater of $5,000 or "10 percent of the tax required to be shown on the return," sec. 6662(d)(1). The Commissioner meets his burden of

---

[9] The Commissioner has met his burden of production on the failure-to-timely-file additions to tax--the copies of the Feltons' 2008 and 2009 returns that are in the record show that the Commissioner received each of them more than one year past their respective due dates. See sec. 7491(c). The Feltons also didn't address these additions to tax in their briefs, so we deem this issue conceded. See Rule 151(e); Petzoldt v. Commissioner, 92 T.C. 661, 683 (1989); Tufft v. Commissioner, T.C. Memo. 2009-59, 97 T.C.M. (CCH) 1305, 1309 (2009).

[*35] production for these penalties with math, because the Feltons'

understatements for 2008 and 2009 well surpass both $5,000 and 10% of the

required tax.[10]

The burden then shifts to the Feltons to try to avoid the penalties by

showing that they acted with reasonable cause and in good faith.  See sec.

6664(c)(1); sec. 1.6664-4(a), Income Tax Regs.[11]  The reasonable-cause exception

to penalties is applied "on a case-by-case basis, taking into account all pertinent

facts and circumstances."  Sec. 1.6664-4(b)(1), Income Tax Regs.  "Circumstances

that may indicate reasonable cause and good faith include an honest

misunderstanding of fact or law that is reasonable in light of all of the facts and

circumstances, including the experience, knowledge, and education of the

taxpayer."  Id.  But "[g]enerally, the most important factor is the extent of the

taxpayer's effort to assess the taxpayer's proper tax liability."  Id.

---

[10] The Commissioner meets the supervisory-approval portion of his burden of production by stipulation.  See sec. 6751(b)(1); Graev v. Commissioner, 149 T.C. ___, ___ (slip op. at 14 n.14) (Dec. 20, 2017) (citing Chai v. Commissioner, 851 F.3d 190, 221 (2d Cir. 2017), aff'g in part, rev'g in part T.C. Memo. 2015-42), supplementing and overruling in part 147 T.C. 460 (2016).

[11] The Feltons did not assert in their petition or argue in their briefs that they had substantial authority for their position.

[*36] The Feltons argue that they have reasonable cause because their facts are unique and the cases in this area are anything but clear. We wouldn't normally penalize taxpayers for making an honest mistake of law in an area that lacks clear guidance. See Van Wyk v. Commissioner, 113 T.C. 440, 449 (1999). But the Feltons have two problems: They cite no precedent favorable to them that arises from gifts to a clergyman who wasn't retired or about to be, and the record shows that the Feltons filed their returns only after the IRS contacted them. The record shows that Reverend Felton--who didn't say he has any tax training--prepared the returns himself. We aren't convinced that he or his wife knew about any of the caselaw in this area when they filed their late returns. And there is no evidence in the record about their efforts to compute their proper tax liability when they filed their returns; that poses a problem because the regulations say that is generally the most important factor for reasonable cause. See sec. 1.6664-4(b)(1). We therefore find for the Commissioner on this issue as well.

The Commissioner made some concessions, so

Decision will be entered under

Rule 155.